[Criminal No. 911.   Filed April 27, 1942.]

[125 Pac. (2d) 441.]

# THE STATE OF ARIZONA, Appellee, v. WILSON MYERS, Appellant.

Mr. Joe Conway, Attorney General, and Mr. W. E. Polley, Assistant Attorney General, and Mr. Sam J. Head, County Attorney, for Appellee.

Mr. Henry Rush and Mr. Albert Haynes Mackenzie, for Appellant.

ROSS, J.—Wilson Myers was informed against in the superior court of Yavapai county for the crime of manslaughter. He was convicted and given a sentence of from 10 to 12 years in the state penitentiary. He has appealed to this court and, in order properly to consider his grievances, it is necessary that we state what the evidence showed on the trial.

Upon his arraignment and at his trial his attorney was Mr. Edward S. Lyman, who was appointed by the court upon a showing by defendant that he was not able to employ an attorney. Mr. Lyman is an attorney of long standing at the bar of the state and at one time was county attorney of Yavapai county.

The homicide occurred on December 1, 1940, at about 5:00 P. M., on South Montezuma Street, Prescott, west of the court house plaza. The evidence at the trial brought out the following facts: A little while before the homicide the deceased, Ralph J. Grantham, accompanied by his 10-year-old son, engaged in a conversation with one Ella Mae Clinton on the street in front of Sharkey's bar. Mrs. Clinton and a Mrs. Jessie Ashley at the time were seated in the former's automobile (and with them was one William Baker), and

had been in said car, which was parked at the curbing, from 2:00 P. M., or for some three hours. It is not necessary to state what Mrs. Clinton and the deceased said to each other further than that deceased admitted to Mrs. Clinton that some time before, while he was drunk, he had said of her that "she had crabs in her eyebrows." Defendant did not hear this conversation but came upon the scene as the deceased was leaving it and was then informed by Mrs. Clinton of what deceased had said. The defendant, saying he would go and talk to the deceased, immediately followed him and the child, who were going north on Montezuma Street on their way home. He overtook them near the St. Michael Hotel, and we let him relate in his own words what happened:

"Well, I just went down the street and was talking to him and I asked him if he had said that, and he said 'Yes, but I was drunk at the time,' and I said 'Are you drunk now?' and he said 'No,' and I said 'Don't you think that is a pretty sorry excuse for talking like that even if you were drunk?' and he said 'What the hell is it to you?' and took a swing at me, and I swung back."

Defendant struck deceased on the chin with his bare fist and the deceased fell backwards, landing on the back of his head and striking the pavement very hard. He said he thought deceased was hurt and that when somebody said "you had better take a mope" he walked away, went around the block and into the Sharkey bar, where he watched the crowd.

William Baker, a witness for the state, was present when Mrs. Clinton told defendant what deceased had said about her, and followed defendant and was within six to eight feet of him and deceased, who were talking together, and testified: " . . . I looked off and something happened, I don't know, but when I looked back Grantham was laying out in the street."

This witness did not see deceased raise his hand or strike the defendant, nor did he see defendant strike deceased, according to his story.

Defendant testified he "was mad for those remarks" deceased had made to his lady friend but had no intention of injuring him when he struck him.

May Harbeson and her husband Lyman W. Harbeson were in their automobile, which was parked at the curbing just in front and to the south of where defendant knocked deceased down, looking at them and did not see deceased raise his hand or strike the defendant, but did see defendant strike deceased and the latter fall to the pavement. Mrs. Harbeson testified the deceased stopped directly in front of their car and defendant came down and stopped too; that they talked a very short time but she was not able to hear their conversation because the doors and windows of the car were closed.

Doctor Joseph McNally, who was close by, was asked to treat the deceased. The doctor testified that when he reached the deceased he was unconscious; that he was in a state or condition of profound shock and was suffering from a cerebral hemorrhage. He ordered deceased removed to the county hospital where he again examined him, at which time he had "begun to regain consciousness." He made an external examination for fracture and directed attendants to lower his head and to put an ice box or pack under his head and keep him quiet, under observation.

Later that night deceased apparently had regained consciousness and left the hospital, without consent or permission, and went to his father's home. The following morning he was in a very serious condition, out of his head. He died December 9, 1940, due to cerebral injury to the back of his whole brain.

The case was tried on March 3 and the verdict of guilty was returned on March 4, 1941.

On March 6 Lyman was allowed by the court to withdraw as attorney for defendant and Henry Rush and Albert H. Mackenzie, attorneys of the state bar, were appointed as substitutes. These latter attorneys filed two motions for a new trial, or perhaps we had better say a motion and an amended motion. These were denied.

The first assignment of error is that the defendant did not receive a fair and impartial trial, due to no fault of his own but "to the distressing fact that the defendant's attorney came nowhere near exploring the possibilities of his client's defense." This assignment is expressly based on that provision of section 44–2005, Arizona Code 1939, reading as follows:

"The court shall also grant a new trial when from any other cause not due to his own fault the defendant has not received a fair and impartial trial."

The charge, in effect, is that Lyman neglected to present for the consideration of the jury available facts known to him, or readily obtainable, showing defendant had a right to do what he did to deceased. One specific act of negligence charged is that the attorney, from the time of his appointment to defend defendant, saw defendant only twice and all told did not spend with him to exceed one-half hour. We suppose the story told by defendant to the jury on his trial was the same story told to his counsel, or, at least, was no more favorable to his side of the case. If so, the time to tell it need not consume anything like thirty minutes. The story was of such a character that it was not advisable or necessary to find corroboration, for it could hardly be neglect on the part of the attorney not to endeavor to find persons who could tell a different story or one exculpating de-

fendant from the results of his own story. Briefly, what must have been the story he told his attorney? We imagine it must have been something like this: "I struck deceased because he insulted my lady friend. I did not intend to hurt him badly, certainly not to kill him. T did not know him and do not believe I had ever seen him before." If the attorney had asked then, and he probably did, "Why did you follow him and when you overtook him ask if he had said the ugly things about your friend?" and defendant would have answered "I was mad." Under such a state of facts, the attorney, if honest, would probably have said: "I am sorry for you but on your own statement you are guilty of the crime of manslaughter; you had no right to follow deceased and undertake to chastise him for his ugly reflections on Mrs. Clinton and, if he undertook to defend himself when you accosted him, before you could claim self-defense you would have to show by the evidence that you, in good faith, endeavored to withdraw from the fight."

■ The rule of law referred to is stated in 30 Corpus Juris. 44, § 210, as follows:

"It is well established that one who is the aggressor or provokes the difficulty in which he kills his assailant cannot invoke the right of self-defense to justify or excuse the homicide, unless he in good faith withdraws from the combat in such a manner as to show his adversary his intention in good faith to desist. It is not enough to justify or excuse the homicide that in the course of the difficulty it became necessary for defendant to kill the deceased in order to save his own life or prevent great bodily harm; but he must also have been free from fault in provoking or continuing the difficulty which resulted in the killing. Accused cannot avail himself of, or shield himself on the ground of, a necessity which he has brought on by his own fault or wrongful act. . . . "

See, also, *Murphy* v. *State,* 33 Ariz. 336, 264 Pac. 685.

Or the attorney might have said: "Since the result was not intended, perhaps a jury, if the facts were fully disclosed to it, would mercifully let you off or find you guilty of battery."

■ When an attorney, whether hired by the defendant or appointed by the court, fairly and honestly submits to the court or jury the facts of the case or, rather, sees that all pertinent facts that might secure his client's acquittal or minimize the offense are submitted, he has done all that the law requires him to do. It is not incumbent upon him further to explore the "possibilities of his client's defense," whatever that may mean.

■ The newly discovered evidence, to the effect that deceased swung at defendant before defendant knocked him down, if true, would be no defense under the circumstances. At the trial there was one witness who said, rather evasively, that deceased raised his arm or hand as if to strike defendant before defendant struck him. And an affidavit in support of the motion for new trial is to the effect that affiant saw deceased motion as though to strike defendant. Such evidence is not newly discovered; neither is it a defense where, as here, the defendant is the aggressor.

■■ Other so-called newly discovered evidence is that the deceased was drunk at the time, while at the trial most of the evidence was that he was not intoxicated and had not been drinking. We cannot see, if it be true he was drunk, how that could make defendant's act any less criminal. A drunken person is no less protected from assault than a sober one.

■■ It is claimed the court erred in not instructing the jury that defendant might be found guilty of assault and battery, or of a lessor offense than manslaughter. The offense charged in the information is the lowest degree of homicide. In this case it was the

result of the commission by defendant of an unlawful act not amounting to a felony and, under section 43–2904, constitutes voluntary manslaughter. As we have seen, the circumstances do not justify or excuse the assault. While an assault and battery are always included in an unlawful homicide, they are not degrees of such offense requiring the court where death results to instruct that the defendant may be found guilty thereof.

But counsel make the point that the court should have submitted to the jury the question whether deceased died from exposure, due to his leaving the hospital against the instructions of the doctor, or to the fall on the pavement. The evidence, however, is conclusive that deceased's death was, quoting Doctor McNally, ''due to cerebral injury, a brain injury.'' There is no evidence that the action of deceased in leaving the hospital had anything to do with his demise. Indeed, it is not clear therefrom that he ever fully recovered consciousness, although he did leave the hospital. But if it be granted that the deceased's act in leaving the hospital hastened his death, or was a contributing cause thereof, or that he would not have died if he had remained in the hospital as directed, we think the better rule is as announced in *State* v. *Baruth,* 47 Wash. 283, 91 Pac. 977, 983, as follows:

'' . . . Where one unlawfully inflicts upon the person of another a wound calculated to endanger or destroy life, it is no defense to a charge of murder where death ensues to show that the wounded person might have recovered if the wound had been more skillfully treated. Even unskillful or negligent treatment of the wound on the part of the wounded person or his physicians which may have aggravated the wound and contributed to the death does not relieve the assailant from liability. He must show that the

negligent and unskillful treatment was the sole cause of death, before he can escape the consequences of his unlawful act on this ground. *State* v. *Edgerton,* 100 Iowa 63, 69 N. W. 280; *State* v. *Landgraf,* 95 Mo. 97, 8 S. W. 237, 6 Am. St. Rep. 26; *Daughdrill* v. *State,* 113 Ala. 7, 21 So. 378; *Sharp* v. *State,* 51 Ark. 147, 10 S. W. 228, 14 Am. St. Rep. 27; *State* v. *Strong,* 153 Mo. 548, 55 S. W. 78; *Denman* v. *State,* 15 Neb. 138, 17 N. W. 347; Wharton on Homicide (3d Ed.) § 35. Measured by this test, the court did not err in excluding the proofs offered. These proofs did not tend to show that the subsequent treatment of the wound was the sole cause of the death, but that the treatment was unskillful, and, at most, only contributed thereto. This did not constitute a defense.''

■ It is next contended that the court erred in failing to instruct the jury on self-defense. There is no evidence calling for such instruction and it would have been error to give it.

■ It is claimed the verdict is against the law in that the blow struck by defendant was with his fist and (a) no undue advantage was taken (b) nor any dangerous weapon used (c) nor was the killing done in a cruel and unusual manner. This proposition is based upon section 43–2906. It is not, however, predicated upon the facts of the case. In *Wiley* v. *State,* 19 Ariz. 346, 170 Pac. 869, 873, 19 L. R. A. 1918D, 373, we said:

"Under certain circumstances, the law justifies or excuses a homicide (sections 178–180, Penal Code), but never where the person who commits it was himself at the time violating some law."

■ This is a sound proposition of law. One may not seek out another, provoke an encounter or difficulty and then claim, because he did not use a dangerous weapon, or take some undue advantage, or act cruelly or in an unusual manner, that he should be excused in the event he kills the person so sought out.

After the conviction in this case the county attorney filed with the court a certified copy of the record of a prior conviction of the defendant of the crime of forgery, a felony, and a statement alleging the identity of the defendant with the person named in such record. Upon inquiry by the court defendant admitted his identity. Likewise at the trial, as a witness, he admitted such previous conviction of forgery. The procedure thus followed is found in section 44–2227, which relates to sentencing persons for second or subsequent offenses.

The penalty for a repeater is fixed by section 43–6111, which provides that when the penalty for a first offender may exceed five years such person is punishable by imprisonment in the state prison not less than 10 years.

Section 43–2904 provides that manslaughter is punishable by imprisonment in the state prison not exceeding 10 years.

It was the duty of the court under the statute to fix the punishment at not less than 10 years, and it was in its discretion to fix the maximum at any number of years up to life. *Valdez* v. *State,* 49 Ariz. 115, 65 Pac. (2d) 29.

The judgment of the lower court is affirmed.

LOCKWOOD, C. J., and McALISTER, J., concur.