[Crim. No. 2612. First Dist., Div. One. Apr. 21, 1950.]

THE PEOPLE, Respondent, v. EUGENE LAGOMARSINO et al., Appellants.

Nathan C. Coghlan for Appellants.

Fred N. Howser, Attorney General, David K. Lener, Deputy Attorney General, Gilbert D. Ferrell, District Attorney, and Fred M. Wyckoff, Deputy District Attorney, for Respondent.

PETERS, P. J.—Lagomarsino, Theus and Williams were charged in four separate counts, with having robbed, on March 7, 1949, Preffer, Adams, Magana and Ayala, a part owner, and three customers of a bar called the "Silver Saddle" located in San Mateo County. They were jointly tried before the court without a jury. Williams was found guilty on counts 1 and 3; the other two defendants were found guilty on counts 1, 3 and 4; and all three defendants were found not guilty on count 2. From the judgment of conviction and from the order denying their motions for a new trial all three defendants appeal. Their two main contentions are that the evidence, as a matter of law, shows that they were induced to commit the crimes by a police informer, and that the information charges but one offense.

The facts disclosed by the record are as follows: Lieutenant Lee, officer in charge of the robbery detail of the San Francisco Police Department, testified that about 6 p. m. on March 6, 1949, he received a telephone call from a man who identified himself as "Mac." This person was subsequently identified as Ralph McGurney, an ex-convict, whom Lee had met on one occasion about four or five months prior to March 6, 1949. The trial court properly prohibited Lee from testifying on direct examination as to the conversation had with McGurney, but the defense elected to cross-examine on this conversation at length. Lee then testified that McGurney told him that three men, whom he named as the three defendants, and who had been, according to McGurney, committing robberies in the bay area, were planning to hold up the "Silver Saddle" bar that night at about 1:30 or 2 o'clock; that the plan was to hold up the owner as he was leaving the bar after it had been closed; that he did not know where the "Silver Saddle" was located, but he promised to call Lee at 10 p. m. with further details. Lee ascertained that a tavern of that name was located in San Mateo County, and informed the Daly City and San Mateo County officials. The operators of the bar were also notified that a holdup might be attempted. McGurney telephoned Lee again at 10 p. m. and told him that the three men were insisting that McGurney use his car in the holdup. Lee told his informant to use his car if he had to, but not to take any part in the holdup. McGurney also told

Lee that the gang would be armed with guns supplied by Theus, one of the defendants.

Lee, together with several San Francisco officers, and with officers from San Mateo County and Daly City, then went to the "Silver Saddle" and surrounded the establishment, hiding in concealed places. Preffer, a part owner of the "Silver Saddle," testified that about 1 a. m. McGurney came into the bar, ordered a drink, consumed it, and then left; that about a half an hour later Lagomarsino came in, and sat down at one end of the bar; that he was followed by McGurney who sat at the other end of the bar; that Theus and Williams then came in, whereupon Lagomarsino jumped up and yelled "This is a stick-up"; that in the bar at that time, in addition to Preffer and the robbers, were the janitor and three customers, Adams, Ayala and Magana; that Williams and Lagomarsino had guns, and Theus, who was masked, had a blackjack; that Theus hit all three customers with the blackjack and compelled them to lie on the floor; that various valuables were removed from the persons of the three customers; that Lagomarsino went to the cash register behind the bar and reported to his companions that there was no money in it; that Theus then hit Preffer with the blackjack and ordered him to open the safe; that Theus removed from the person of the witness his wallet, wristwatch and pen; that Williams stayed at the door of the tavern with a gun in his hand covering the patrons who were lying on the floor; that after the three defendants, whom he identified at the trial, had been on the premises something over 10 minutes, an automobile horn sounded outside and they left; that he then heard shots, and two of the defendants, Lagomarsino and Williams, ran back into the bar and tried to hide; that the officers rushed in and found Lagomarsino hiding under a table and Williams hiding in the women's rest room.

Several of the officers testified as to the arrival of the defendants accompanied by McGurney who was driving; that after the holdup started they observed what was going on through several windows; that after the robbery started McGurney came outside and sat in the automobile and then tooted the horn; that the three defendants came running out, led by Theus; that several shots were fired at Theus and he was captured outside; that Lagomarsino and Williams were captured inside the bar as recounted by Preffer. Guns were found where Lagomarsino and Williams had been hiding. McGurney was not arrested and was not produced as a witness. His

whereabouts were not disclosed. There was substantial evidence that the three defendants were not drunk.

Each of the defendants testified. They told substantially the same story. They admitted being present at the "Silver Saddle," but all contended that the robbery was conceived and planned by McGurney. Lagomarsino stated that he had known McGurney for seven or eight years; that on the evening of March 6, 1949, he met McGurney in a San Francisco bar about 6 :30; that he had a couple of beers, and that McGurney induced him to put some capsules, identified as "goof balls," into his drinks; that he became very "high" as a result, and then had several drinks of whiskey; that about 10 p. m he and McGurney picked up the witness' girl friend at her place of work, and took her to a restaurant where McGurney telephoned someone; that they took his girl friend home about 11 :30 p. m.; that he then asked McGurney to take him home as he was feeling "dopey"; that instead McGurney took him to a bar where he had more whiskey and another capsule; that they then went to Theus' home where a party was in progress and where he had more to drink and several more capsules; that he saw McGurney give some of the capsules to Theus and Williams; that they then ran out of drinking material and McGurney suggested taking a ride in his car to get more whiskey; that after the four got into McGurney's car, McGurney drove towards the "Silver Saddle"; that on the way McGurney suggested the holdup and furnished the guns. Lagomarsino. admitted his participation in the robbery and his arrest at the scene.

Theus testified that he first met McGurney when he arrived at the Theus home with Lagomarsino about midnight; that McGurney gave him some capsules to put into his drinks, which made him very drunk; that when the four left in McGurney's car he was drunk and fell asleep; that he knew absolutely nothing about the plans to hold up the "Silver Saddle"; that he awakened when the party arrived in front of the bar, and accompanied his companions inside thinking they were going in to get some whiskey; that he knew nothing of any holdup, and that he had no blackjack.

Williams testified substantially as did Theus, except that he admitted learning about the proposed holdup from McGurney while McGurney was driving towards the "Silver Saddle." He testified that the guns were furnished by McGurney and that the whole idea of the robbery originated with McGurney.

Various admissions were made by several of the defendants after their arrests and admitted into evidence against the particular declarant. Lagomarsino, for example, told a police inspector on the afternoon of March 7, 1949, that early on March 6th, Theus had told him about the proposed robbery and furnished the guns, and that he, Lagomarsino, had demanded $1,500 of the proposed take as his share.

Defendants do not deny that a robbery as defined in section 211 of the Penal Code took place, and that they participated, but they contend that the uncontradicted evidence demonstrates that McGurney, acting under the supervision of the San Francisco police, originated the plan, and that it was McGurney who persuaded and induced them to commit the crime. In support of this defense of entrapment they contend that the uncontradicted evidence shows that it was McGurney who drove and owned the holdup car, and that it was McGurney who entered the bar a half hour before the holdup apparently to ''case'' the tavern. Other portions of the record are referred to, and it is many times pointed out that the police made no attempt to prevent the holdup, but waited until it had occurred before interfering.

The rule as to when an entrapment is a defense was stated as follows in *People* v. *Lindsey,* 91 Cal.App.2d 914, 917 [205 P.2d 1114] : ''It is only when the criminal design is conceived in the mind of the officer and does not originate with the accused, and a decoy is used to ensnare the innocent and law-abiding by persuasion, deceitful representation, inducement or allurement into the commission of the crime, that there is entrapment.'' Among the many cases supporting this rule are *People* v. *Malone,* 117 Cal.App. 629, 633 [4 P.2d 287] ; *People* v. *Kennedy,* 66 Cal.App.2d 522, 523 [152 P.2d 513] ; *People* v. *Makovsky,* 3 Cal.2d 366, 369 [44 P.2d 536] ; *People* v. *Grosofsky,* 73 Cal.App.2d 15, 18 [165 P.2d 757] ; *People* v. *Jackson,* 80 Cal.App.2d 386, 390 [181 P.2d 889] ; *People* v. *Cherry,* 39 Cal.App.2d 149, 151 [102 P.2d 546].

Even if it be assumed that the evidence demonstrates, without conflict, that McGurney was a police decoy and participated in the holdup under instructions from the police department, such assumption would not aid appellants unless the evidence also showed, without conflict, that the criminal design originated with the decoy. ■ Officers, if they know or suspect that a crime is about to be committed, may, through a feigned accomplice, facilitate or even aid in its consummation. If the accused commits or attempts to commit the crime,

it is no defense that the police decoy may have aided or even encouraged him in his criminal design. This was well illustrated in the case of *People* v. *Lanzit*, 70 Cal.App. 498 [233 P. 816]. In that case, Lanzit wanted to murder his wife. He told Woodhead that he would like to get rid of her. Woodhead suggested dynamite, made the bomb, showed him how it worked, placed the bomb in the desired location and was arranging the detonator when the police arrived on the scene, having been warned in advance by Woodhead. Lanzit was found guilty of an attempt to commit murder, and the conviction was affirmed. On the defense of entrapment, the court said (p. 509) : ''When officers of the law are informed that a person intends to commit a crime against the property or person of another, the law permits them to afford opportunities for its commission and to lay traps which may result in the detection of the offender. To this end a person may be engaged to act with the one who is suspected and to be present with him at the time the crime is to be committed; and if the accused, having himself originally conceived the criminal intent, commits such of the overt acts as are necessary to complete the offense, he will not be protected from punishment by reason of the fact that when the acts were done by him the person who was present with the knowledge and approval of the authorities aided in and encouraged their perpetration.''

That the police acting through a decoy actually furnished the automobile used in the holdup is of no assistance to appellants. This was the express holding in *People* v. *Malone*, 117 Cal.App. 629 [4 P.2d 287], one of the leading cases on entrapment. There the police decoy furnished a truck to the defendants knowing that it was to be used in a burglary. This ''was not such an inducement to commit the crime as will relieve the appellants from responsibility. . . . The question whether the intent to commit this crime originated with the officer or with the appellants was a question of fact for the jury, and their verdict finds ample support in the evidence.'' (P. 634.)

Tested by these standards, and resolving all conflicts in the evidence in favor of the People, as we must, and indulging in all reasonable inferences from the evidence in support of the judgment, as the law requires, it is quite clear that defendants' contention that the evidence shows, as a matter of law, that the criminal design originated with McGurney is

unsound. While all three defendants so testified, the trial court was not bound by their testimony even had it been uncontradicted, which it was not. The basic story of defendants is that they were drunk as a result of their drinking and consumption of the capsules supposedly administered by McGurney. The witnesses to the holdup testified that the men were not drunk when arrested. Lagomarsino admitted that Theus planned the robbery. Lee's story of how the police learned of the proposed holdup, brought out by the defense on his cross-examination, basically contradicts defendants' story. While the prosecution did not produce McGurney to contradict defendants, and while that is a factor that the trier of the facts was entitled to and undoubtedly did consider, it is not a conclusive factor. It might be pointed out that defendants failed to produce any of the persons who were at the party at Theus' house (other than defendants) to corroborate their story of the capsules or of their condition, and Lagomarsino failed to produce his girl friend to corroborate his story as to his condition. These were all matters to be considered by the trial court. Its implied finding that there was no entrapment finds ample support in the evidence, and cannot be disturbed.

The other major contention of defendants is that the evidence demonstrates that but one robbery was committed and not three, although four separate individuals were robbed. The contention is that there was but one intent, and that the robbery of the four individuals was part of the same offense. It is urged that sentencing two of the defendants three times, and one of the defendants twice, for the same offense, constituted a violation of article 1, section 13, of the state Constitution prohibiting the placing of any person in jeopardy twice for the same offense.

This contention presents a most interesting problem. An examination of the cases, and the pertinent authorities, indicates that on the general question the states of the United States are in hopeless conflict. (Notes, 20 A.L.R. 341; 113 A.L.R. 222; 18 Cal.L.Rev. 171; 22 C.J.S. 452, § 298; 20 Harv. L.Rev. 642; 37 Harv.L.Rev. 912.) California, however, has definitely aligned itself with those states that hold that, so far as crimes against the person are concerned (murder, assault, robbery, etc.), although there may be but one act or intent, there are as many crimes as there are persons affected.

In *People* v. *Majors*, 65 Cal. 138 [3 P. 597, 52 Am.Rep. 295], a defendant killed two persons by the same act. It was held

that he had committed two separate and distinct offenses, and that a conviction or acquittal of one did not bar a prosecution for the other. In *People* v. *Brannon,* 70 Cal.App. 225 [233 P. 88], the evidence showed that the defendant shot at W, but killed X. He was indicted for assault with a deadly weapon and murder. He was tried first on the assault charge and acquitted. He then sought to interpose the defense of once in jeopardy at his murder trial. He was convicted, and his conviction affirmed on the theory that there were separate offenses committed although there had been but one act. The court recognized that a conflict exists on the subject, but elected to follow those states that hold that a separate crime exists as to each person harmed by the act of defendant.

Defendants place their greatest reliance on *People* v. *Stephens,* 79 Cal. 428 [21 P. 856, 4 L.R.A. 845]. There appellant was prosecuted for libel in that he had published a libelous remark in his newspaper concerning one Bell. He pleaded and attempted to show by evidence that he had been previously tried and acquitted of the same charge growing out of the publication of the same article. This evidence was excluded by the trial court. The proffered evidence was to the effect that the instant prosecution was based on the second paragraph in the same article which had been the basis of the first prosecution, the first one being based on the first paragraph, but both concerning Bell. The court reversed the conviction, holding that there had been but one indivisible libel. This case is somewhat similar to *People* v. *Puppilo,* 100 Cal.App. 559 [280 P. 545], holding that one in possession of two revolvers is guilty of but one offense under the California Gun Law. (Stats. 1923, p. 695, chap. 339.) It is also similar to the many cases mentioned in the above notes holding that where, by an act of taking (larceny) several articles belonging to the same individual are stolen, there is but one offense. But where the property of several individuals is taken in the course of a larceny the states are in hopeless conflict as to whether one crime or several have been committed. On this question we have been referred to no California case, but in *People* v. *Sheik,* 75 Cal.App. 421 [243 P. 39], the defendant was convicted on six separate counts of obtaining money by false pretenses, although the false representations were made to all of the six people involved at the same time. The court held that there were as many offenses as there were individuals affected.

The federal cases seem to support the separate offense theory.

Thus, although in *Robinson* v. *United States*, 143 F.2d 276, it was held that when a defendant transports several women across state lines for immoral purposes in one car, he is guilty of but one offense, this case was expressly disapproved in *Crespo* v. *United States*, 151 F.2d 44, 46 (*certiorari* denied 327 U.S. 758 [66 S.Ct. 520, 90 L.Ed. 991]), and in *United States* v. *St. Clair*, 62 F.Supp. 795, it was held that such an act constituted separate offenses. (See, also, *Oddo* v. *United States*, 171 F.2d 854.)

▇ Whatever conflict may exist in the cases involving offenses against property, when we come to offenses against persons, there is more unanimity. Particularly is this true of robbery cases, the offenses here involved. The majority, and certainly the better rule, is that there is a separate offense committed against each person robbed. Obviously, a robbery of several persons, where property is removed from each person, involves a separate act and a separate intent toward each victim. (See *People* v. *Rodgers*, 184 App.Div. 461 [171 N.Y.S. 451], aff. in 226 N.Y. 671 [123 N.E. 882]; *Orcutt* v. *State*, 52 Okla. Cr. 217 [3 P.2d 912]; *Schoolcraft* v. *State*, 80 Okla. Cr. 20 [178 P.2d 641]; *In re Allison*, 13 Colo. 525 [22 P. 820, 16 Am.St.Rep. 224]; *Fox* v. *State*, 50 Ark. 528 [8 S.W. 836]; but, see, *People* v. *Perrello*, 350 Ill. 231 [182 N.E. 748]; *State* v. *Citius*, 331 Mo. 605 [56 S.W.2d 72].)

As already pointed out, California, in cases involving assaults, has held that there are as many offenses as there are individuals affected, although but one act has been committed. The robbery cases also involve a crime against the person. But in the robbery case, unlike the assault cases, there are separate acts of robbing, and a separate intent as to each individual robbed. It is clear that if there are separate offenses in the assault cases where but one act and intent is involved (and this is settled in this state), there are separate offenses in the robbery cases where separate acts are necessarily involved.

The judgment and order appealed from are affirmed.

Bray, J., and Schottky, J. pro tem., concurred.