[Crim. No. 4597. Second Dist., Div. One. Aug. 23, 1951.]

THE PEOPLE, Respondent, v. FERNE E. CLARK,
Appellant.

J. Russell Myers for Appellant.

Edmund G. Brown, Attorney General, and Dan Kaufmann, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the District Attorney of Los Angeles County, defendant was charged with the crime of manslaughter, a felony, in that on or about the 9th day of June, 1950, she wilfully, unlawfully, feloniously, and without malice, while engaged in the driving of a vehicle

in the commission of an unlawful act not amounting to a felony, with gross negligence, and while in the commission of a lawful act, which might produce death in an unlawful manner with gross negligence, killed Phil R. V. H. Porter; the information further alleged that the death of said decedent was the proximate result of the driving of said vehicle by defendant.

Following a plea of not guilty the cause proceeded to trial before a jury which returned a verdict finding defendant "guilty of manslaughter with gross negligence, a felony." Motion for a new trial was denied. Upon arraignment of the defendant for judgment, proceedings were ordered suspended and she was granted conditional probation. This is an appeal by defendant from the conviction and sentence, and from the order denying her motion for a new trial. ██ The attempted appeal from the conviction and sentence, being unauthorized, must be dismissed (*People* v. *D'Elia,* 73 Cal.App.2d 764, 766 [167 P.2d 253]; *People* v. *Becerra,* 104 Cal.App.2d 295, 297 [230 P.2d 872]).

Epitomizing the evidence necessary for consideration of the ground urged for reversal of the order denying defendant's motion for a new trial, the record reflects that shortly after 2 o'clock on the morning of June 9, 1950, one Nathan Elkins was backing a loaded truck out of the driveway on the west side of San Pedro Street between 66th and 67th Streets in the city of Los Angeles. While backing the truck out of the driveway onto the street Elkins looked to the south and saw an automobile proceeding north on San Pedro Street several blocks away. All the lights of the truck were on, including the taillight and two reflectors. The street lights were also burning on San Pedro Street. Elkins backed the truck out of the driveway, made a left turn, straightened the vehicle out so that it headed north and was about in the center of San Pedro Street proceeding north at approximately 10 miles an hour.

The truck proceeded forward about 10 feet when it was struck just back of the right front fender by the automobile driven by the defendant. The truck caught fire and defendant's vehicle careened into a lamp post. The night was clear, the street was dry and in good condition. Defendant was driving about 50 miles an hour. The witness Elkins testified that he heard no sound of any brakes being applied nor did he hear the sound of a horn. He also testified that in observing defendant's automobile prior to the impact, "it never slowed down."

Police officers arrived shortly after the accident and observed that Elkins' truck was demolished by fire; that there was dirt and debris in the street where the two vehicles had come together; that there was a dark brush mark indicating the point of impact 18 feet west of the east curb, and that the light standard struck by defendant's car was broken. One of the police officers asked defendant if she was hurt and she replied that her knee was cut. He asked defendant if her passenger was hurt, to which she responded, "No, he was just out drunk." The officer asked defendant to get out of the car and he smelled a strong odor of alcohol. Upon inquiring of her as to what happened, defendant said, "I think that tanker hit us head-on." Defendant told the officer that her injuries were not such that she needed or wanted medical treatment. The police officer testified concerning the defendant, "Well, she was sort of, seemed very joyous, I mean, over the fact that she knocked over that ornamental light standard. She said she was jumping—said, 'Look what I done to that ornamental light standard.' " This officer testified that in his opinion defendant was under the influence of intoxicating liquor.

She and her passenger were taken in an ambulance to the receiving hospital. Upon inquiry of the hospital physician as to whether defendant was in condition to undergo a sobriety examination, the doctor answered in the affirmative. The officers then gave her a sobriety test consisting of what is characterized as the "line test," to ascertain if she was able to walk a line, "placing her heel and toe down the line." In this examination, according to the officer's testimony, defendant failed, being able to take only approximately two or three steps before staggering off the line one way or the other. A second test was given defendant consisting of her "standing with her heels and toes together, placing her arms outstretched, taking her right forefinger and touching her nose, and doing the same with her left." According to the officer she failed to pass this test. At the time of the giving of these tests the police officers detected the odor of alcohol on the defendant's breath. When asked if she was driving the car she responded that she was. When asked if she had been drinking defendant responded in the affirmative. When inquiry was made as to where she had been drinking, she replied that she and her companion had been drinking at a couple of places; that she bought a bottle and was drinking in a café in the 7300 block on San Pedro Street. She stated that she and the decedent

went to this café, ordered some beer, using it as a "chaser" while they consumed the bottle of whiskey. That when they left this place the decedent was "in pretty bad condition" and defendant decided it would be better for her to drive. That she put him on the right hand side of the driver's seat and that he fell over against her several times. That she proceeded north on San Pedro Street but was unable to estimate her speed. She further said that "something loomed up in front of her and hit her head-on, and she thought it was some kind of a diesel—she said she couldn't understand why he would hit her head-on." The officer further testified that at this time her speech was "slurred" and, "she was very hilarious and very cocky."

A second officer, who accompanied the one above referred to, testified that in his opinion the defendant "was drunk."

The record further reflects that the victim was admitted to the Los Angeles County General Hospital on June 9, 1950, where he was examined by a resident physician. The doctor found that the victim was suffering from cerebral concussion and probable fracture and dislocation of the cervical spine with cord injury. The doctor prescribed a head halter in order to put some traction on the neck, aimed at immobilizing the neck and preventing further dislocation. The doctor also informed the family of the decedent that his condition was serious and that he would not want to accept the responsibility for the decedent's removal, advising the family to leave him in the hospital. The hospital records indicated that the victim remained at the hospital until the 10th of July when he was released to his mother and taken away by her in a private ambulance.

On the following day, July 11, the victim died. An autopsy surgeon gave as his opinion that the cause of death was spinal cord injury due to fracture of the cervical vertebra, this being the spinal vertebral column in the neck region, or in ordinary language, a broken neck.

The autopsy revealed that just above the cervical swelling of the spinal cord it was reduced to a yellowish, pulpy mass, held together by only a few strands of the forward portion, and this indicated to the autopsy surgeon that extensive damage had been done to the spinal cord and that the prospects of survival after such an injury to the cord were practically nil.

As the first ground for reversal appellant contends that the trial court committed error in refusing to give the jury the following instruction: "To find the defendant guilty

you must find from the evidence not only that her conduct was of the kind described as essential to constitute involuntary manslaughter, and that such conduct was a proximate cause of the death involved in this case, *but you must also find that the death occurred within one year and one day from and after June 9, 1950 as a result of the defendant's conduct.*" (Italics added.)

Appellant's contention appears to be that but for intervening causes, viz., removal of the victim from the general hospital by his mother, contrary to the advice of the physician in charge of the case, approximately one month after hospitalization, the victim "may have lived indefinitely"; that the foregoing intervening event, "resulted in the death and/or accelerated the death." This claim is predicated upon testimony given by the autopsy surgeon that during the month elapsing between the date of injury and the removal there would "normally" be "some healing process"; that in the opinion of the witness the aforesaid removal of the victim "would injure his chances" of surviving. There is also testimony by Dr. James St. John, a resident physician at the Los Angeles County General Hospital, as follows:

"Q. By Mr. Myers (Appellant's counsel) Well, Doctor, as I understand, it is your opinion, is it not, that a patient with this type of injury should not have been moved, is that right? A. Yes.

"Q. Well, I will ask this, you testified, Doctor, that you advised that this patient should not be released from the hospital? A. Yes.

"Q. What was the reason for giving that advice? A. Because his condition was critical and I would not want to assume responsibility for anything that might happen to him were he not under my care.

"Q. And was that the only reason, or was it with regard to the possible movement of the spine? A. Possible movement of the spine during transportation could accelerate his death."

Dr. Edgar L. Tversky gave the following testimony:

"Q. In your opinion, Doctor, would it be advisable to move a man that had the type of injury discussed from one hospital to another a month and a day after the injury? A. If that happened to me, I certainly wouldn't countenance, permit or entertain the idea for one instant."

It would seem fair to say that the medical testimony was to the effect that in the type of injury with which we are here concerned, death would be expected immediately, and

if not, as Dr. St. John testified, "It seems that the most critical period may be within the first few hours and the first week. If they make it after that period the patient may die any time within months or years of a recurrent infection."

The only authority cited by appellant to support her claim is section 194 of the Penal Code which insofar as here pertinent, reads:

"To make the killing either murder or manslaughter, it is required that the party die within a year and a day after the stroke received or the cause of death administered; . . .".

■ We fail to perceive in Penal Code, section 194, any language making it applicable to the situation which appellant contends exists in this case, viz., that although the victim died within the prescribed year and a day, his demise was hastened by the actions of third persons, and but for these actions he would have lived longer than a year and a day. As we view appellant's contention, she is attempting to read into the statute an additional requirement, that not only must death have occurred within the year and day, but that death must not have been accelerated to a date within that period by some cause other than the act of the accused.

■ Under the guise of construction, courts may not add to or detract from the expressed legislative intent. We are not authorized to insert qualifying provisions in nor rewrite a statute to conform to an assumed legislative intention which does not appear from the language of the statutory provision (Code Civ. Proc., § 1858).

■ The reason for both the common-law rule and Penal Code section 194 also precludes the construction contended for by appellant. The requirement that it must appear that the victim died within a year and a day is merely a rule of evidence. In other words, unless the party dies within that time the prosecution will not be permitted to show that he died of the injury allegedly received (*People* v. *Murphy*, 39 Cal. 52, 55; *State* v. *Huff*, 11 Nev. 17).

■ Where death of the victim occurs subsequent to a year and a day of the act charged against the accused, there arises a conclusive presumption that the victim died from some cause other than the act of the defendant. ■ However, where the victim dies within the time prescribed by the statute, the reason for the application of the presumption vanishes, and there remains only the question of whether or not the act of the accused was the proximate cause of the victim's death. The fact that death may have been accelerated becomes un-

important unless it be shown that the accelerating cause was also a supervening cause, in which latter case, the defendant is relieved of responsibility for the death in that such act was manifestly not the proximate cause. If the victim dies within a year and a day, and if the act charged against the accused be the ultimate, though not the immediate cause of death, it is criminal (Eden's Principles of Penal Law, pp. 233-234).

Thus, in *People* v. *McGee,* 31 Cal.2d 229, 240 [187 P.2d 706], it was held that where the wound inflicted by the accused operates as a cause of death, the fact that the malpractice of attending surgeons may have had some causative influence will not relieve the accused from full responsibility for the ultimate result of his act. ▮▮▮▮ Applying the same reasoning to the instant case, it cannot be held under the facts here present, that the removal of the victim from the general hospital by his mother, 31 days after his hospitalization is in fact an intervening force, and it cannot in law amount to a supervening cause. (See, also, *People* v. *Cobler,* 2 Cal.App.2d 375, 379 [37 P.2d 869], and *State* v. *Myers,* 59 Ariz. 200 [125 P.2d 441].)

Furthermore, even though we concede the applicability of Penal Code section 194 notwithstanding the fact that the decedent did die within a year and a day of appellant's act, nevertheless, the record does not support her contention that although the victim sustained serious injuries, he may have lived indefinitely except for intervening events, and that there were supervening causes which resulted in the death or accelerated the death of the victim. Therefore, refusal to give the requested instruction did not amount to prejudicial error. There is a total absence of any evidence to show that the conditions under which the victim was removed accelerated his death or were supervening causes thereof. While expressing the opinion that removal of the victim was fraught with danger, none of the medical witnesses were in possession of the actual facts surrounding such removal or which occurred in connection with the victim following such removal, nor were any of the hypothetical questions propounded to the doctors based upon an assumption showing the conditions under which the victim was removed, or what occurred thereafter. Although some of the doctors testified they would not recommend such removal, when pressed for an opinion as to whether such action might hasten death, one of the physicians replied: "Well, I would say that is quite possible. I would

have to know all the conditions of the manner of his removal and so forth to express an exact opinion."

When the attending physician at the general hospital was similarly interrogated, his response was: "I can't answer the question as you have asked it because it would depend on the conditions of his removal and on the degree of injury that he had suffered and probably on the stability that you felt he had at the time of the removal."

Again, in answer to a similar question the same witness replied: "That is a difficult question to answer, I repeat. As you said, he died eight to twelve hours after he was removed and that would depend to a certain extent on the treatment that he received after he arrived at the other hospital and to the treatment or care he received in being transported."

The record is totally barren of any evidence showing that under the actual conditions of the victim's removal his death had been hastened.

In the final analysis, appellant's contentions amount to a claim that the victim's death was not proximately caused by the former's act. The court fully and fairly instructed the jury upon the issue of proximate cause, and upon that issue the triers of fact found against appellant. Under the state of the record before us it cannot reasonably be held that the finding of the jury upon this issue was without substantial support in the evidence.

Finally, appellant earnestly urges that the testimony of the police officers is insufficient to establish a finding of intoxication when there was expert medical testimony that appellant had received injuries which impaired her ability to undergo sobriety tests.

Two police officers testified that appellant was under the influence of liquor when they examined her after the accident. It is her contention that she was not under the influence of liquor and she produced medical testimony that her behavior as testified to by the officers, as well as her inability to respond to physical tests, were occasioned by reason of injuries received by her in the accident.

It is now well settled that opinion testimony as to intoxication is not limited to expert testimony and is a matter about which any witness may express an opinion (*People* v. *Moore*, 70 Cal.App.2d 158, 164, 165 [160 P.2d 857]; *People* v. *Hernandez*, 70 Cal.App.2d 190, 192 [160 P.2d 564]).

The testimony given by the officers merely created a conflict with that given by the doctor who testified in appel-

lant's behalf. It was for the jury to determine the value and weight of the evidence, as well as the credibility of the respective witnesses. Apellant's complaint goes to the weight rather than to the admissibility of the challenged testimony.

During the cross-examination of Police Officer Beckhelm it was brought out that while appellant was at the receiving hospital following the accident a sobriety test was given her by Dr. Arnold of the hospital staff. At the trial no effort was made by appellant to ascertain what the result of such test was, but she now claims that no evidence was offered by the prosecution "as to any findings of the physician who performed such sobriety test." The prosecution was not required to call Dr. Arnold, and further, if appellant believed that his testimony would be helpful to her cause, the process of the court was available to her to secure his presence and the benefit, if any, of his testimony.

 Appellant argues that the jury's finding of gross negligence was based upon the implied finding that she was under the influence of liquor. While there was substantial evidence, if believed by the jury, to support an implied finding that appellant was intoxicated, it cannot reasonably be said that the verdict was not founded upon the actions and conduct of appellant in the driving of the motor vehicle, without regard to the question of her claimed intoxication. In his instructions to the jury the trial judge clearly, fairly and correctly defined negligence and gross negligence, and further instructed the jury of the necessity of the existence of the latter in order to convict. Neither the information nor the instructions contained any mention of the fact that the charge was based upon appellant's intoxication. Disregarding the claimed intoxication there was evidence showing that on a clear night, driving upon a dry street, fairly well lighted, appellant, operating her vehicle at a high rate of speed, collided with a slow-moving vehicle from the rear; that she had ample opportunity to avoid the last-mentioned vehicle, but made no attempt to slow down or sound her horn. From these and other facts shown, the jury was entitled to infer that appellant was grossly negligent without reference to her intoxication. In fact the verdict of the jury found appellant "guilty of manslaughter with gross negligence, a felony."

For the foregoing reasons, the attempted appeal from the conviction and sentence is dismissed. The order denying defendant's motion for a new trial is affirmed.

Doran, J., and Drapeau, J., concurred.