THE PEOPLE, Respondent, v. VICTOR L. DE CASAUS, Appellant.

Morris Lavine for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

MOORE, P. J.—Appellant was convicted under six counts of involuntary manslaughter. Dissatisfied with the verdict and the sentence, he seeks a reversal of the judgment on the grounds of insufficiency of the evidence, errors in refusing instructions, errors in rulings at the trial and excess of penalty.

### Evidence Sufficient

Driving a two-toned 1955 automobile, appellant left his office on North Main Street, Los Angeles, at 8:25 p. m. on September 26, 1955, headed for Imperial Valley. After 8:30, just east of Soto Street on the San Bernardino Freeway going eastward, he cut in front of the witness Jeffrey who was going at 55 miles per hour in the center lane. Having passed a car in the third or inner lane, appellant returned to it and his left front wheel brushed against the center divider. Proceeding rapidly, he swerved into the center lane again to circumvent another car and when he returned to the third lane he brushed the center divider again. Appellant passed the witness Crook while moving at about 85 miles per hour in the center lane, and passed out of sight, but as Mr. Crook rounded the curve he saw something go over the center divider in much dust and smoke, out of which came a car whose driver fell out dead while still in the westbound side of the boulevard. Mrs.

Hallstrom parked on the apron when she observed appellant's car overtaking her, speeding and swerving. She saw him twice sideswipe a station wagon, and on the second swipe saw him take it "across the divider," filling the air with smoke, sparks, dust and debris. The station wagon was driven by one Robert Golden. He, his wife and three children were killed.

David Hearn, returning to Lós Angeles from Phoenix, entered the freeway at Rosemead. His car was one of the four in the accident. He suffered a broken wrist, injured knee, contusions and bruises. His wife received a broken ankle, a severed tendon, a concussion and cuts on the face; their daughter's arm was broken, her face and arms cut; their 5-year-old son received a broken arm.

Appellant's machine came to a standstill 4 feet from the curb on the *westbound* lane. When the witness Jeffrey arrived, he approached appellant and called to him to stop, as the latter walked away saying he was going to see his brother. He could not explain the blood on his face but merely said: "I don't know how this happened. They stopped suddenly and I had to drive over the divider." Mr. Jeffrey returned appellant to the officers.

William L. Spackler, age 24, had been driving on the freeway toward Los Angeles when his ivory-colored sedan apparently collided with the Golden car from across the center divider. His body was seen by the witness Crook when it fell from his car. He had died from a 2-inch wound in the neck which severed the jugular vein and carotid artery; a hemorrhage due to rupture of the spleen and liver; also he suffered fractures of the thigh bone and both collar bones, an evulsion of the left ear, five broken ribs, a collapsed lung, a pint of blood in pleural and peritoneal cavities. Near Spackler was the Golden family, except the body of Mrs. Golden which lay on the floor of her station wagon.

Officers Sillings and Miller perceived the accident at 8:47 p. m.; parked their patrol car; saw defendant with Jeffrey; looked at the horrible results of the accident; radioed for patrol units and ambulances. When they returned to the spot where they had left appellant, he had departed. He was walking up the shoulder of the eastbound lane, 25 feet away from the paved highway. Officer Miller ordered him to occupy the rear seat in the patrol car. Appellant produced his driver's licenses of California and New Mexico. The odor of alcohol was prevalent. Sillings was of the opinion that

appellant was under the influence of alcohol. He had no brother in that vicinity.

The officers scanned the premises in search of evidence of reckless driving. Officer Agatha found a single skid mark from one wheel, 141 feet long in the third lane going west. It veered slightly to the left. The highway divider, he found, is a raised barrier 6 inches high and 10 feet wide dividing the freeway. Appellant told Agatha he was involved in the accident and pointed to his own machine across the freeway and said he was not sure what caused the accident; that he had had a couple of drinks at his office prior to leaving.

The proof was that it was not raining; the streets were dry; the weather clear, visibility good. Officer Agatha testified that there were lights enough to illuminate the roadway "so everything can be seen clearly"; that the right rear wheel of Golden's station wagon was flat and there was expert proof that the break of the tire resulted from external force.

After the officers observed the strong odor of alcohol, they asked appellant to take the sobriety test. He willingly complied, but his responses were unsatisfactory. He pointed out to them his own car and stated that he was on his way to Albuquerque. When asked whether he knew that his automobile was in the westbound side of the freeway, appellant did not know. He said he had left his office; entered the freeway, headed east; followed a group of cars; somebody hit him in the rear; he could not stop but swung to the left.

Officers Winkelman and Weimer visited with appellant and took him to the Angelus Emergency Hospital. He was moving his neck around and rubbing it. He told them he had had two Scotch and Sodas in a bar on Main Street near his office in Los Angeles. They advised him that in view of a definite alcoholic odor on his breath, it might be to his advantage to have a blood alcohol test to determine his blood's alcoholic content. By reason of the overcrowded condition at the Angelus, they took appellant to the Beverly Hospital. As they drove along, appellant repeated his statement about having imbibed two Scotch and Sodas at a bar on Main Street and remarked that they were at that time two blocks from the bar and would pass it. Officer Winkelman testified that as he spoke they were 7 miles from Main Street, Los Angeles.

At the Beverly Hospital, Dr. Goff removed blood from appellant's arm at 11:30 p. m. It was analyzed by DeLoss R. Paul, a biochemist, for the presence of ethanol. It contained 0.180 of one per cent ethyl alcohol by weight volume. Mr. Paul testified that when a person's blood contains above 0.150 per cent alcohol, he is under its influence and could *not* "operate an automobile as an ordinarily prudent and cautious person." In cross-examination, he said, by the "time anyone has a definite concentration in the blood, all people will react the same."

In August 1955 appellant's reflexes had been normal. On October 25, 1955, one month after the accident, he was treated for back strain and numerous contusions.

Appellant denied practically all the substantial testimony offered by the People; testified that after he had driven onto the freeway, he stayed in the center lane; traveled around 50 or 55 miles per hour; did not drive next to the divider, was in the center lane, the car to his left as he went into the turn turned abruptly in front of appellant, he slammed on his brakes; was hit in the rear and propelled backward. When the machine swerved, he came forward and fell out right at the center lane, "I mean the eastbound shoulder." He testified that his car never sideswiped any other automobile; did not strike any other vehicle; Jeffrey did not call him; he did not tell Jeffrey he had driven over the divider; he exercised reasonable care at all times.

The evidence proved that neither the rear of appellant's vehicle nor its bumper had been damaged. The left front fender was buckled into a "V" shape. The impact was so severe that the left door would not open. The hood was pushed away from the body and up in the air. The witness Tobey introduced paint scrapings to prove that appellant's machine contacted the car of Hearn, and that the Golden station wagon had collided with Spackler's sedan, and Hearn's car hit the right front door of the Goldens' station wagon.

From the evidence and the inferences arising therefrom, it is abundantly established that appellant, while under the influence of intoxicating liquor, drove his automobile at grossly excessive speed along the freeway eastward from Los Angeles and thereby caused the deaths of six persons. By his exhaustive and able argument, he presents no sound reason for holding that the evidence was insufficient.

Appellant's argument is such a discussion as would have been appropriately addressed to the jury. If it had been, they

had rejected it and adopted evidence which justifiably established his guilt. In that event, the judgment will not on that ground be disturbed. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Clark,* 106 Cal.App.2d 271, 280 [235 P.2d 56]; *People* v. *Freeman,* 16 Cal.App.2d 101 [60 P.2d 333]; *People* v. *Miller,* 112 Cal.App. 535, 537 [297 P. 40].)

 Appellant contends that where the operator of an automobile is suddenly stricken by an illness and becomes unconscious, he is not liable for a subsequent accident while his vehicle is out of control, citing *Moore* v. *Capital Transit Co.,* 226 F.2d 57 [96 App.D.C. 335]. By analogy he applies that case to the factual situation claimed by him. He says that he was thrown from his car as the immediate result of its being struck in the rear, that he had no control over the car from the moment it crossed the divider and collided with the other cars while it was driverless, and that he is not responsible for its movements after he was thrown out. Conceding this to be correct from a legal standpoint, it can avail appellant nothing for the jury rejected the factual basis upon which the argument rests.

It is contended that the evidence does not show that at any time while appellant was driving his automobile, it killed any of the persons found dead on the freeway after he had finished his ride. But from the established facts such act and result were properly inferred. The exercise of the deductive processes is as important in weighing evidence as is the act of received direct proof of a pertinent act.

Appellant contends that the statute fixing the basic speed law is unconstitutional; that it is too vague, indefinite and uncertain; that it permits every juror to guess for himself ''as to whether the speed is greater than is reasonable, or prudent''; that it violates due process of law as provided by Articles I and IV of, and the Fourteenth Amendment to, the Constitution of the United States, citing *Orloff* v. *Los Angeles Turf Club,* 36 Cal.2d 734, 739 [227 P.2d 449]; *Lanzetta* v. *New Jersey,* 306 U.S. 451 [59 S.Ct. 618, 8 L.Ed. 888] etc. He forgets that the decision as to whether a highway was too rough, too congested, or too narrow for the accused to drive in a safe manner at his speed in excess of 75 miles per hour is one for the trial court to make based upon the evidence. Every motorist who drives at a rapid speed does so knowing that his judgment will be reviewed by the trial judge,

in the event such motorist should be accused of negligent or reckless driving.

■ Where the evidence justifies it, there is no inhibition upon a court's finding that a motorist drove on a highway at 85 miles an hour; that it was crowded with vehicles or pedestrians or had chuck holes at every step and that a reasonable person would have driven at a speed not in excess of a lesser number of miles per hour. ■ The contention that the basic speed law is unconstitutional cannot be sustained. (*Ex parte Daniels,* 183 Cal. 636, 647 [192 P. 442, 21 A.L.R. 1172]; *In re Leach,* 215 Cal. 536, 544 [12 P.2d 3].)

■ The contention that the killing of six people by only one act does not authorize six accusations and convictions of manslaughter cannot be sustained. (*People* v. *Majors,* 65 Cal. 138 [3 P. 597]; *People* v. *Defoor,* 100 Cal. 150 [34 P. 642]; *People* v. *Lagomarsino,* 97 Cal.App.2d 92 [217 P.2d 124]; *People* v. *Holman,* 72 Cal.App.2d 75, 100 [164 P.2d 297]; Fricke's California Criminal Law, sixth edition, p. 389; 20 A.L.R. 341; 113 A.L.A. 222.) In the Holman case, *supra,* after the defendant had set fire to a hotel and 22 people burned to death, he was properly convicted of homicide as to all 22. In the Lagomarsino case, *supra,* where the defendant robbed many people, he was properly convicted of robbery for each victim of his crime.

It follows, therefore, that contrary to appellant's contention, he was correctly sentenced to one year in jail for each offense.

■ Section 19a was not intended to limit imprisonment in the county jail to a period of one year where several misdemeanors have been committed and the sentences run consecutively. (*People* v. *Carr,* 6 Cal.2d 227, 228 [57 P.2d 489]; see *General Casualty Co.* v. *Justice's Court,* 41 Cal.App.2d 784, 788 [107 P.2d 663].) "Conviction of misdemeanor" as used in section 19a, Penal Code, means: conviction of *a* misdemeanor.

The court properly rejected seven of appellant's proffered instructions for the reason that they were repetitious of instructions which the court actually read to the jury. By his eighth rejected instruction he would have had the jury directed to ignore the publicity the case had received from the newspapers, radio and other news-casting agencies but to be solely guided by the evidence they had heard in the court room. The court properly refused to read such instruction. No showing had been made that the jury had read or heard stories from other sources or that there was any reason to suspect they had, or that there was any other need for the

instruction. Besides, the court told the jury that they must determine the facts from the evidence produced before them.

The judgment is affirmed.

Fox, J., and Ashburn, J., concurred.

A petition for a rehearing was denied May 14, 1957, and appellant's petition for a hearing by the Supreme Court was denied June 12, 1957.