In the Matter of JAMES R. MORFORD, Esquire, and MORTON E. EVANS, Esquire.

(*April* 18, 1951.)

WOLCOTT, CH., RICHARDS, C. J., TERRY and CAREY, J. J., SEITZ, V. CH, and HERRMANN, J., sitting.

*Clarence A. Southerland* and *Alexander L. Nichols*, petitioners by appointment of the Court.

*Daniel J. Layton* for the respondent, James R. Morford.

*Arthur G. Connolly* for the respondent, Morton E. Evans.

Supreme Court.

PER CURIAM:·

The petition prays that the respondents be required to show cause why disciplinary measures should not be directed against them. The respondents waived the issuance of a rule and filed their answers to the petition praying that it be dismissed. By stipulation of the parties, the case is to be determined upon the petition, answers and transcript of the testimony taken before the Censor Committee, excluding therefrom the testimony of certain witnesses deemed to be immaterial.

The facts as we find them must be set forth at some length. In January, 1949 one of the respondents, James R. Morford, Esquire (hereinafter called "Morford") was retained as counsel for the defendant in the case of *Short and Walls Lumber Co. v. Florence Blome*, a civil action in the Superior Court of New Castle County. The theory of the plaintiff in that action was that the defendant, Blome, had purchased lumber from one William Sapp with knowledge that. Sapp had obtained such lumber from the plaintiff by false pretenses.

On February 3, 1949, while Sapp was in jail in Kent County serving an 18-months sentence on a number of criminal charges of false pretenses, he was interviewed by Morford in the course of preparing the defense in the civil action. Morford did not represent Sapp and had had no prior association with him. At that time, Sapp exonerated Morford's client in the civil action of any knowledge of the false pretenses which Sapp had practiced on the plaintiff therein. At the same time, Sapp told Morford that he had records which would materially assist the defendant in the defense of the civil action. He said that such records were in his wife's possession but that he would get them for Morford.

In March, 1949 Sapp was interviewed in the Kent County jail by counsel for the plaintiff in the civil action. This took place in the presence of the attorney who represented Sapp in the criminal cases. During this interview, Sapp executed an affidavit directly implicating Morford's client in the false pretenses practiced on the plaintiff in the civil action. This affidavit was used as the basis for a motion for summary judgment by plaintiff. Subsequently the motion was denied. See *Short & Walls Lumber Co. v. Blome*, 6 *Terry* 397, 75 *A.* 2d 234.

When Morford saw that Sapp had given plaintiff's attorney an affidavit which contained a story diametrically opposed to the remarks which Sapp had previously made to him, he concluded that Sapp was probably lying about the records which he said were in his wife's possession.

Thereafter, Morford was also retained as counsel for the same defendant in another suit involving a similar transaction but with a different plaintiff, and in which Sapp also was to be a witness.

By letter dated May 10, 1950 the Attorney General's office was advised that Illinois wished to extradite Sapp on a parole violation.

On May 17, Sapp's commuted Kent County sentence expired and he was transferred to New Castle County to await sentence on

other criminal charges of false pretenses pending in New Castle County. The court had indicated that in view of the extent of the prior sentence in Kent County the New Castle County sentence would be for one or two days only. As soon as it was completed, a hearing on the application of Illinois to extradite Sapp was to be held. Sapp was removed to the New Castle County Workhouse. On the same day, the Attorney General's office arranged with the Illinois authorities for the extradition hearing to be changed to May 25, the day after the civil cases had been set for trial.

On May 17, due to another engagement on May 24, Morford instructed the other respondent, his junior associate, Morton E. Evans, Esquire (hereinafter called "Evans") to ask for a continuance. Counsel for the plaintiff refused to consent to a continuance and on May 19 Evans applied for a continuance to one of the Judges of the Superior Court. Plaintiff's counsel objected on the ground that Sapp's testimony was indispensable to the plaintiff's case and that Sapp probably would not be available at a later date because of the imminence of his extradition to Illinois. The trial of the civil action was continued until June 6 and it was indicated that Sapp would be sentenced on the criminal charges in New Castle County for a period which would include the new trial date.

On the same day, Morford received a phone call from a guard at the Workhouse stating that Sapp desired to see him. Morford was going away for the weekend so he sent his associate, Evans, to interview Sapp. This Evans did on the same day.

During the interview, Sapp discussed the civil case and told Evans in effect that Blome had not been guilty of any wrongdoing. Sapp explained the affidavit previously given plaintiff on the basis of some alleged inducement by plaintiff's attorney. He mentioned the pending extradition matter and the nature of his offense in Illinois. Sapp told Evans that he wanted to get out on bail so that he could sell some personal property which he owned. When Evans told him that he could not get out on bail unless he

had money to pay a bondsman, Sapp said he had $50.00 which could be used for that purpose. Sapp asked Evans to represent him but Evans refused. However, he did tell Sapp that he would see whether it was all right to arrange to get another attorney to represent him. Sapp also told Evans that if he got out on bail he would be able to get the records from his wife which he had previously mentioned to Morford.

The following Sunday evening, upon Morford's return, Evans telephoned and related to him at length the conversation he had had with Sapp. Morford approved Evans' suggestion that he obtain Robert Huber, Esquire, (hereinafter called "Huber") to represent Sapp to obtain bail. Later that same evening, Evans called Huber who agreed to represent Sapp in the matter of obtaining bail. Evans told Huber that he did not want to represent Sapp because he was a material witness in a civil case in which he was involved. Morford testified that, "We never considered that we would represent him."

Through a mistake, Sapp was not brought to Court on Monday, May 22, but Huber nevertheless applied for bail on Sapp's behalf. Huber's efforts to obtain the consent of the Attorney General's office to agree to a release of Sapp on bail were unsuccessful because of the Attorney General's fear that Sapp would leave the jurisdiction. Huber reported this failure to Evans by telephone.

On May 23, 1950, Sapp was brought into Court and Huber introduced himself to him. Huber made it clear that he was representing Sapp solely with respect to obtaining bail. Thereafter, Huber accompanied by Evans sought out the representative of the Attorney General's office and vigorously renewed the request that he consent to Sapp's admission to bail. Finally, the Attorney General's representative agreed not to object to Sapp's admission to bail if the bail was set at $1500. Bail in that amount was fixed.

Later the same day, Huber met Evans, apparently without prearrangement, as Evans was leaving the Family Court, and told him that he had been unsuccessful in obtaining a bondsman.

Evans once again actively associated himself with Huber in attempting to arrange for a bondsman but both failed. While this was taking place, Sapp asked Evans to draw a bill of sale for him for certain property which he owned down in Maryland. Evans agreed. Eventually, on the same day, Huber obtained bail through a bondsman he had previously used. The fee charged by the bondsman was $75.00. Sapp stated to Huber and Evans that he had only $50.00 and asked Evans to loan him the additional amount. Up to this point, the record does not show that Morford had any knowledge of Evans' active assistance of Huber. Evans then called Morford on the telephone and told Morford that Sapp needed $25.00 in addition to his own money in order to obtain bail. Morford asked Evans if he thought Sapp was good for it; Evans indicated he thought he was, and Morford assented to the firm's advancing this sum to Sapp. Morford testified that he already knew his firm was representing Sapp with respect to drawing a bill of sale for the Maryland property. However, we conclude from the testimony of Evans and from the sequence of events that Morford did not know of this relationship prior to this time.

Subsequently, it was discovered that Sapp actually needed $45.00 and Evans, apparently without Morford's knowledge, advanced the additional sum from the firm's account. It must be noted that by this time the civil action in question had been prepared for trial by Morford. It must also be presumed that Morford believed Huber was representing Sapp in connection with his release from prison.

On May 24, after Sapp's release on bail, he came to Evans' office to get the bill of sale prepared for the personal property, which he stated he had agreed to sell to someone in Earlsville, Maryland. On May 25, Sapp called Evans from Dover and told him he was going to Washington the next day to get his wife to sign the bill of sale. On May 26, Sapp called Evans from Washington, stating that his wife had signed the bill of sale and that he was on his way to Earlsville, Maryland to close the sale of the personal property but that he needed $10.00 to get there. At

Evan's request, Huber wired Sapp $10.00 and was thereafter reimbursed by Evans. Nothing has been heard from Sapp since May 26, 1950. His bond was defaulted.

After Sapp's default, Evans paid Huber $50.00 as a fee. The sum was advanced by Morford from his personal funds pursuant to an undertaking made by Evans with Huber prior to Sapp's default. It does not appear that Morford had any knowledge of this undertaking prior to the payment. It was not contemplated by Morford, Evans or Huber that the payment of Huber by Morford was made out of any sense of obligation other than a moral one because Morford had involved him in the matter. If paid by Sapp, Huber was to reimbürse Morford.

We think the respondents are entitled to have this Court state categorically that they are not charged with spiriting away a possibly unfavorable witness, or with having attempted to procure bail for the witness so that he could absent himself from the jurisdiction. The report of the Censor Committee specifically exonerates the respondents from any such charges. We think it fair to state, after reviewing the record, that we think the conclusion of the Censor Committee in this respect is correct.

The petition makes two charges of unprofessional conduct on the part of the respondents, as follows:

(1) That they violated Canon 39 of the Canons of Professional Ethics of the American Bar Association approved by the Delaware State Bar Association in 1946; and

(2) That they are guilty of a violation of the high standards of professional conduct required of an attorney in the practice of his profession.

Canon 39 provides as follows: "A lawyer may properly interview any witness or prospective witness for the opposing side in any civil or criminal action without the consent of opposing counsel or party. In doing so, however, he should scrupulously avoid any suggestion calculated to induce the witness to suppress or

deviate from the truth, or in any degree to affect his free and untrammeled conduct when appearing at the trial or on the witness stand."

We think Canon 39 is applicable to the case at bar. We further think that the word "suggestion" contained in the canon is properly construed to embrace actions as well as words. Accordingly, the actions of the respondents must be tested by the standards of professional conduct implicit in the canon. In addition, we think the conduct of the respondents must be evaluated in the light of the ordinary standards required of a lawyer in the practice of his profession. *Cf. Thornton on Attorneys at Law,* Sec. 774.

Respondents' counsel contend that the canon as well as the general rule governing the professional conduct of attorneys has application only to acts or words actually intended by the attorney to affect the free and untrammeled conduct of a witness or prospective witness. We think the construction put upon the rule by the respondents, which limits its application to situations in which the attorney actually and consciously intended wrongdoing, is too limited in scope and does violence to the high standard of conduct expected of the profession. Intent is a necessary element of a violation of the standard, but this intent may be either actual or constructed from the conduct of the attorney. We conceive this to be necessary if the trust and confidence of the public in the legal profession is to be retained.

Two conclusions must be reached before the respondents may be subjected to discipline. The first of these is that the conduct of the respondents was of such character as probably to induce the witness Sapp to suppress or deviate from the truth, or in any degree to affect his free and untrammeled conduct at the trial. After carefully considering the record before us, we have reached this conclusion. We think that the conduct of the respondents would probably have had that effect upon a person of Sapp's known character.

The second conclusion necessary to be reached before the re-

spondents may be disciplined is that they either consciously intended that result, or must from the facts before us be held to have intended that result. This is the vital question in the case. The respondents are not subject to discipline unless we so conclude.

■ The authorities are generally in accord that proceedings of this nature are not criminal in character but are in the nature of an investigation by the court into the conduct of its own officers. As such, the proceeding is neither wholly criminal nor civil in nature, but lies somewhere between the two. The point is important because it relates directly to the question of the degree of proof required to support the charges made against the respondents.

The reported cases are not in harmony upon the question of the degree of proof required. A rather extensive collection of them will be found at 105 *A. L. R.* 985. The courts have ranged from a requirement of proof by the preponderance of the evidence to a requirement of proof beyond a reasonable doubt. We think the proper rule lies between these two extremes, for the reason that proceedings of this type are neither wholly civil nor criminal in nature. In adopting this rule, we are adopting the rule of the numerical and, we think, better considered weight of authority. It is difficult to define exactly the degree of proof required, but we think the clearest expression of a definition is to require that the charges be proved by a convincing preponderance of the evidence. Obviously, this requirement is something less than required in a criminal prosecution, and is something more than is required in a civil proceeding.

The Court is unanimously agreed upon the above stated legal rule to be applied to the facts and circumstances of this case and upon the degree of evidence necessary to sustain a charge of violation.

■ The respondents are specifically absolved of any conscious intent to induce Sapp to suppress or deviate from the truth, or in any degree to affect his free and untrammeled con-

duct at the trial. The question, therefore, is whether, under the facts and circumstances of the case, they nevertheless should be held to have intended that result. On this question the Court is evenly divided.

It necessarily follows that the prayers of the petition must be denied.

An order may be presented.