DAVID WARREN QUILLEN, Defendant Below, Appellant, v. THE STATE OF DELAWARE, Plaintiff Below, Appellee.

*(January 6, 1955.)*

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, J. J., sitting.

*Daniel J. Layton, Jr.,* and *Everett F. Warrington* for Appellant.

*John J. McNeilly,* Deputy Attorney-General (Vincent A. Theisen, Chief Deputy Attorney-General, with him on the brief) for the State.

Supreme Court of the State of Delaware, No. 21, 1954.

SOUTHERLAND, C. J.:

The appellant, David Warren Quillen, was indicted and tried for the murder of Raymond L. Banks, Sr., by shooting him with a shotgun. Quillen was found guilty of murder in the second degree, and sentenced to imprisonment for life. He appeals, alleging error (1) in the refusal of the Court to quash a panel of additional jurors, and (2) in the charge to the jury.

A brief summary of the State's case is as follows:[1]

---

[1] The testimony respecting the shooting was not transcribed. Counsel agree that we may take the facts from the statement of the contentions of the State and of defendant in the court's charge to the jury. The medical testimony (or most of it) is before us.

Quillen and Banks owned adjoining farms in Baltimore Hundred, Sussex County. There had apparently been trouble between them. On December 8, 1952, Banks, his son Raymond, and some other men were working on the Banks farm at a point near the division line. During the morning Quillen had come out on his farm and watched the work for a while and about one o'clock Quillen again came out with his son Harry, who brought a tractor and started ploughing a rye field that Banks had sown on his own farm. No trouble occurred at that time.

At about 4:30 in the afternoon the Quillens returned. Harry began ploughing again in the rye field. Banks asked Quillen to "talk this over". Quillen replied: "I didn't come here to talk. I came here to kill or be killed." Further words were spoken— not provocative on Banks' part—and Quillen then struck Banks with a stick, knocking him down. Raymond then threw Quillen to the ground and struck him in the face several times. Harry got off the tractor and advanced toward them, swinging an iron bar. Raymond walked away. Quillen got up, walked about eight feet to his car, opened the trunk compartment, took out a shotgun and said: "Scatter, I am going to shoot." Banks started toward the front of the car, but Quillen shot at him, hitting his right thigh. He fell to the ground badly wounded.

Banks was taken to the Beebe Hospital at Lewes. After admission he was examined by Dr. Tormet, house physician, and by Dr. Trickett, a practicing physician of Lewes. For the first thirty minutes Banks appeared to Dr. Tormet as a man whose life was in danger. Plasma and blood were administered. Dr. Trickett found the patient in a state of shock. He treated the wound, which he described as serious.

Banks rallied under treatment and steadily improved. On December 26th Dr. Trickett consulted Dr. James C. Beebe, Jr. upon the advisability of a skin graft. Dr. Beebe determined that it should be done. He performed the operation on December 29th. A cast was applied from the groin to the knee of the injured leg. After the operation Banks "was doing fine", but four days later—January 2, 1953—he died suddenly. Dr. Trickett

diagnosed the immediate cause of death as "a massive pulmonary embolism".[2] This diagnosis was confirmed by the autopsy. Both Dr. Tormet and Dr. Trickett were of opinion that the clot came from the site of the wound.

That the State's evidence fully justified the verdict is not questioned. Indeed, it would have supported a finding of first degree murder.

The case for the defense was (1) that the shooting was committed in self-defense and (2) that the gunshot wound was not the cause of death.

The testimony in support of the claim of self-defense was summarized by the President Judge of the Superior Court as follows:

"The defendant contends that on December 8, 1952, at about five o'clock in the afternoon he was told by his son that employees of the deceased were plowing in the defendant's field; that he and his son decided to go and plow as much of the deceased's lands as they plowed of the defendant's field; that his son, Harry, took his tractor and plows to the field; that he, the defendant, drove there in his car after putting his shotgun and three shells in the trunk of the car; that he parked his car on his side of the division line about 15 yards from the county road, got out and walked over to count the number of rows which the Banks people had plowed on his lands; that as he went back toward his car, the deceased, his son and his son-in-law came near him; that the defendant and the deceased had some conversation during which the defendant said, "I came down here to die on my own land," and did not say, "I came here to kill or be killed;" that he, the defendant, continued to walk toward his car, followed by the three persons named, and when he came

---

[2]Defined by Dr. Trickett as follows: "A massive pulmonary embolism is nothing more than a large blood clot, which may start as a small clot, which starts to progress from wherever it arises, to progress through the vessels into the right heart and then into the lung."

near the car they threw him to the ground with Raymond Banks, Jr., on top of him, James Kelly standing on one hand and Raymond Banks, Sr., standing on the other hand; that while they were in this position Raymond Banks, Jr., repeatedly struck him in the face and chest.

"The defendant denies hitting the deceased with a stick, but says that the walking stick which he had with him in the beginning was snatched away from him by Raymond Banks, Jr., before he was thrown to the ground.

"The defendant further contends that these people continued their attack upon him until his son Harry came up with a wrench, whereupon they let him up; that after he got up he was somewhat dazed, but after coming to his senses saw that Raymond Banks, Jr., was standing on the front bumper of the defendant's car with a gun or revolver in his hand; that Raymond Banks, Sr., was leaning on the left front fender talking to his son; that the defendant then walked about three yards to the trunk of his car, unlocked it and loaded his shotgun; that he then stepped over to his left with the gun in his hands, looked up and saw that Raymond Banks, Jr., was pointing his revolver at him; that he then thought the deceased was telling his son to shoot him; that the defendant then said, 'Get moving', and when they did not move, he shot his gun at the deceased, intending to hit him in the foot or ankle; that almost at the same time as this shot, Raymond Banks, Jr., fired his revolver twice. The defendant says he shot at Raymond Banks, Sr., instead of the son because the only visible part of the son's body was the upper part, the shooting of which would have been fatal, whereas he thought by wounding the father in the ankle or foot he could thereby stop the fracas."

We pause to observe that from the defense itself it appears that the attack upon Quillen had ceased; that he had time to walk to his car, open it, and take out and load his shotgun; and that he then fired, not at the source of danger, but upon an unarmed man.

In support of the contention that the gunshot wound did not cause death, the defense called three physcians. They all expressed the opinion that the wound was one not (or "probably not") likely to endanger life, and that the skin-graft operation "could be" an independent cause of death. Dr. Crane thought it more reasonable to relate the clot to the skin-graft operation. None of them suggested that the skin-graft operation was improper procedure, or that there had been any maltreatment of the wound.

We turn now to the questions raised by this appeal and consider first the errors assigned to the court's charge to the jury.

1. The principal attack on the Court's charge is directed to those portions of the charge dealing with the question of the burden of proof. The following excerpts from the charge sufficiently show its tenor:

With respect to the presumption of malice the Court charged as follows:

"Malice is implied by law from every deliberate and cruel act committed by one person against another, no matter how sudden such act may be, for the law considers that he who does a cruel act voluntarily does it maliciously; and whenever such an act from which death ensues is proven by the prosecution unaccompanied by circumstances of justification, excuse or mitigation, the law presumes that the homicide was committed with malice and it is, therefore, incumbent upon the accused to establish that the act done was not malicious and, therefore, does not amount to murder."

With respect to the issue of self-defense the Court charged:

"The defendant contends that he shot the deceased in self-defense, and it therefore becomes necessary for us to explain to you what that means.

"The burden of establishing self-defense to the satisfaction of the jury rests upon the defendant."

Coupled with the objection to the instructions is an objection to the refusal to charge upon reasonable doubt as follows:

"If, at the end of the whole case, there is reasonable doubt as to whether the prisoner killed the deceased with a malicious intention the prosecution has not made out a case of murder in either degree and the prisoner is entitled to an acquittal of the charge of murder."

This prayer, coupled with the objections to the charge as given, squarely raises the question of the correctness of the instructions above quoted.

■■■ So far as concerns the requested charge upon reasonable doubt, we note that the Court gave the customary charge that the State must prove every element of the crime beyond a reasonable doubt, and reaffirmed the necessity for such proof in later portions of the charge. The words "at the end of the whole case" were not included. The failure to charge as requested is not error if the instructions upon the burden of proof are correct. These are said to embody an erroneous rule of law, in that they require the accused to prove certain defenses to the satisfaction of the jury.

It is quite true, as Quillen contends, that the instructions given require the accused to do more than merely to go forward with evidence of self-defense. They embody the rule that the burden of proof actually shifts to the accused when he asserts circumstances of excuse or mitigation, and that he must establish these circumstances with a required measure of proof. The majority rule is that the defendant is entitled to an acquital if the circumstances of excuse or mitigation raise a reasonable doubt. See Wharton, *Criminal Evidence,* § 211 and § 906, and cases cited; and see *Woolington v. Director of Public Prosecutions* [1935] *A. C.* 462. But there is much authority to the contrary. The minority rule is that circumstances of excuses or mitigation must be shown by a preponderance of the evidence, or, as in North Carolina and Delaware, to the satisfaction of the jury. See the following cases: *Commonwealth v. Drum,* 58 *Pa.* 9;

*Commonwealth v. Brown,* 17 *Pa. Dist. R.* 89; *Commonwealth v. Palmer,* 222 *Pa.* 299, 71 *A.* 100, 19 *L. R. A., N. S.,* 483; *Commonwealth v. York,* 9 *Metc., Mass.,* 93, 43 *Am. Dec.* 373; *State v. Ballou,* 20 *R. I.* 607, 40 *A.* 861; *State v. Sappienza,* 84 *Ohio St.* 63, 95 *N. E.* 381, 34 *L. R. A., N. S.,* 1118; *State v. Dillard,* 59 *W. Va.* 197, 53 *S. E.* 117; *State v. Willis,* 63 *N. C.* 26; *State v. Lindsay,* 82 *S. C.* 486, 63 *S. E.* 1064, 1135. The American authorities supporting this rule are collected in a note to *Commonwealth v. Palmer, supra,* in 19 *L. R. A., N. S.,* pages 492-494.

Delaware has always followed the minority rule. The reported cases setting forth charges to juries embodying this rule are too numerous even to list. An examination of our reports reveals upwards of fifty cases in which the law has been thus announced in varying ways with respect to the various applications of the rule. These applications cover the presumption of malice arising from a homicide and the burden on the accused to rebut it, *State v. Frazier, Houst. Cr. Cas.* 176, 197; the presumption of malice from the use of a deadly weapon, *State v. Naylor,* 5 *Boyce* 99, 90 *A.* 880; the burden of proving self-defense or insanity to the satisfaction of the jury, *State v. Vines, Houst. Cr. Cas.* 424; *State v. Emory,* 5 *Penn.* 126, 58 *A.* 1036; *State v. Cole,* 2 *Penn.* 344, 34 *A.* 391; and the burden of proving sufficient provocation to reduce the offense to manslaughter. *State v. Woodward, Houst. Cr. Cas.* 455.

When we ask why Delaware has held to the minority rule, whereas many states, including most of those admitted after the formation of the Union, have departed from it, the answer is plain. Apart from statute our law is in general the common law of England as it existed in 1776, although modified in many respects. *Constitution of 1776,* Art. 25. And in particular our law of homicide is derived directly from the English common law as it had been expounded prior to that time. Except for the division of murder into degrees, no important changes in the law of homicide have been made by our legislature. 11 *Del. C.* § 571 *et seq.*—at least none important to this inquiry. And it is per-

tinent to note that the Sections of the 1852 Code[3] establishing
the degrees of murder attempted no real definitions of murder in
the first degree or of murder in the second degree. The distinc-
tion was based solely upon the distinction between the artificial
concepts of "express malice" and "implied malice" found in the
common law—a distinction existing in the statutes of few other
states today. Upon the enactment of the 1852 *Code* our courts
at once turned to the common law explanation of these con-
cepts and adopted Blackstone's definitions. See the discussion
of this point in *Bantum v. State,* 7 *Terry* 487, 85 *A.* 2d 741.

In the same way, we find that our law respecting the bur-
den of proof is the common law as announced by Blackstone
and earlier writers. Speaking of homicide excused on account of
accident or self-preservation or alleviated into manslaughter,
Blackstone says:

"And all these circumstances of justification, excuse or alle-
viation, it is incumbent upon the prisoner to make out to the
satisfaction of the jury. * * *" 12 *Bl. Com.* p. 201.

The development of the law of homicide in England prior
to 1776, and its adoption as the common law of Massachusetts,
are set forth in Chief Justice Shaw's opinion in *Commonwealth
v. York, supra,* in which what is now the minority rule on the
burden of proof is discussed at length and approved. For a re-
view of the early Pennsylvania cases, and a defense of the rule by
logical analysis in the light of the rule of "reasonable doubt",
see the opinion of Judge (later Chief Justice) von Moschzisker
in *Commonwealth v. Brown, supra.* The law stated in these cases
is that the rule of reasonable doubt applies to proof of the
*corpus delicti* and of the defendant's complicity; when the de-
fendant relies on circumstances of excuse or mitigation he must
establish them by a preponderance of the evidence.[4] An exam-

---

[3] §§ 2842, 2843.

[4] See "Some Rules of Evidence: Reasonable Doubt in Civil and Criminal
Cases", 10 *Am. L. Rev.* 642, in which the writer urges that the application of
the rule of reasonable doubt should be confined "to those facts only which go
to prove the *corpus delicti*". p. 664.

ination of these cases and of the cases from other states cited above establish beyond question that the law as announced by Blackstone has been accepted as correct and has been consistently followed in all those states.

It is true that the question now before us has never heretofore been expressly decided by the Supreme Court of Delaware. Prior to the Constitution of 1897 there was no right of appeal in criminal cases and our law of homicide is found in reports of the charges to juries by the old Court of Oyer and Terminer— a three-judge court. By 1897, when the right of review was accorded, the general principles of our law of homicide, and in particular the law upon the burden of proof, had taken definite form. Thereafter, they have been uniformly adhered to,[5] and have not hitherto been drawn in question.

No doubt there is much to be said in favor of the majority rule. And perhaps we have in the past adhered too closely to the common law of Eighteenth Century England.[6] But there is a limit to the power of the courts to overturn precedents. We are dealing with rules of the law of homicide approved by many able judges and accepted without criticism from the bench, the bar, or the public, for more than a hundred years. They still exist in several of our sister states. It is difficult to think that they have been so productive to injustice as to call for the drastic change we are now asked to make. This is not a case like *Bantum v. State, supra,* of misdirection arising from lack of facts to support the charge; the instructions here assailed were in complete accord with settled principles. If the law that they embody is to be changed, the change must come from the Legislature.

[5]*State v. Robinson,* 3 *Terry* 419, 36 *A.* 2d 27, retains the charge that the burden is on the defendant to establish self-defense to the satisfaction of the jury. This is immediately followed by a further charge that if upon the whole state of the evidence the State has not established guilt beyond a reasonable doubt there must be an acquittal. *Cf. State v. Bailey,* 79 *Conn.* 589, 65 *A.* 951. An attempt thus to reconcile the two rules meets logical difficulties.

[6]See Dolan, "The Constitution of Delaware", Vol. LIX, *Dickinson Law Review,* p. 75.

In saying this we are not to be understood as approving all of the charges on the burden of proof that appear in our reports. In *State v. Gardner, Houst. Cr. Cas.* 146, the court appears to have charged that circumstances of provocation must be proved beyond a reasonable doubt—a pronouncement that is certainly not the law. In *State v. Prettyman,* 6 *Boyce* 452, 100 *A.* 476, 478, the burden was placed upon the accused to prove an alibi "to the satisfaction of the jury." The correctness of this instruction is certainly doubtful, since an alibi does not seek to excuse or mitigate a homicide; it is a flat denial of complicity in the crime. But the instructions here given were correct.

A word must be said about the use of the phrase "to the satisfaction of the jury", which, in one form or another, appears in our charges upon the burden of proof cast upon the accused. It is criticized as importing something more than a preponderance of the evidence. Notwithstanding that some courts have taken a different view, we think that it imports only proof by a preponderance of the evidence. The words "satisfied" and "satisfaction" as they appear in the charges on the defendant's burden of proof are employed without qualifying language; whereas in the charge on the State's burden of proof they are accompanied by the phrase "beyond a reasonable doubt." Obviously the one is not the equivalent of the other and could not be so understood. Except in disciplinary proceedings, which are *sui generis,*[7] the only recognized "measure of persuasion" other than proof beyond a reasonable doubt is proof by a preponderance of the evidence. We cannot think that the jury was misled by the use of the word "satisfaction" in the context in which it appears. Verbal niceties of this sort, we suspect, play little part in the actual application by a jury of the charge of the court.[8]

We find no error in the charge upon the burden of proof.

[7]See *In re Morford,* 7 *Terry* 144, 152, 80 *A.* 2d 429.

[8]*Cf.* Wigmore's criticism of "cobwebby distinctions between 'preponderance of evidence' and 'satisfaction of the jury' ". IX *Wigmore on Evidence,* § 2498, n. 1.

2. Quillen next assigns error on the court's refusal to charge the jury as follows:

"If the person attacked is without fault and is in a place where he has a right to be and is put in reasonably apparent danger of losing his life or suffering great bodily harm and the danger is imminent, he is not required by the law to retreat but may stand his ground, repel force by force, and if, in the reasonable exercise of his right to do so, he kills his assailant, he is justified in so doing and is entitled to a verdict of not guilty."

The Court did not give the requested charge, but did charge as follows:

"The law recognizes the right of self-defense for the purpose of preventing but not of revenging an injury to the person.

"If the deceased, Raymond Banks, or his companions, first attacked the defendant, even though the attack was of such a character as to create in the mind of the defendant a reasonable belief that he was in danger of death or great bodily harm, it was his duty to retreat, if he could safely do so, or to use other reasonable means as were within his power to avoid killing Raymond Banks.

"No one may take the life of another even in the exercise of the right of self-defense, unless there are no other available means of escape from death or great bodily [harm]. But if you are satisfied from the evidence that Raymond Banks, or his companions first attacked the defendant and that from the character of the attack the defendant had reasonable cause to believe and did believe that he was in immediate danger of death or great bodily harm and that he had no other reasonable means of avoiding the danger, then the killing would be a justifiable act of self-defense and the accused should be acquitted of any crime.

"If a weapon be raised to shoot or strike, or where the danger of other personal violence be imminent, the person in such danger may protect himself by striking the first blow, for the

purpose of repelling and preventing the attempted injury to himself, using no more force than is necessary for the purpose. But where one is assaulted in a sudden affray and, in the judgment of the jury, honestly believed on sufficient and reasonable grounds that he was in imminent danger of being killed or suffering great bodily harm, he would have in self-defense the right to use a deadly weapon against his assailant. But in exercising such right in a manner likely to cause death or bring bodily harm to his assailant he must be closely pressed and must have retreated as far as he safely and conveniently could, in good faith, with the honest intention to avoid the danger of the assault."

That this is the common law, and the established law of Delaware, is conceded. It is argued, however, that it should be modified by adopting the rule embodied in the requested instruction. Defendant cites *Beard v. United States*, 158 *U. S.* 550, 15 *S. Ct.* 962, 39 *L. Ed.* 1086; *Brown v. United States*, 256 *U. S.* 335, 41 *S. Ct.* 501, 65 *L. Ed.* 961; 26 *Am. Jur., Homicide*, § 151.

The authorities are far from unanimous on the question of the extent of the duty to retreat in the law of homicide. See 26 *Am. Jur., Homicide*, §§ 149, 150; 1 *Wharton, Criminal Law*, § 616. In some jurisdictions the common law rule of retreat has been abrogated and in others modified; and in the latter jurisdictions the cases are not wholly in accord. 1 *Warren on Homicide*, § 157; 1 *Michie on Homicide*, § 118 ff. Warren states the so-called modified rule as follows:

"* * * where one who is in a place where he has a right to be and has done nothing to provoke an assault is assaulted, and the nature of the assault taken in connection with all the circumstances of the case is such as to give him reasonable ground to believe, and he does believe, that the assailant intends to take his life or to do him great bodily harm, he is not obliged to retreat * * *."

We see no sufficient reason to change the settled law of this State. What we have said above with respect to the bur-

den of proof is to a great extent applicable here. Moreover, we venture the opinion that upon analysis it will be found that the Delaware rule upon retreat is not radically different from the modified rule above stated. In effect, our law is that the defendant must retreat only if he may safely do so. Whether or not he had a safe opportunity to retreat is a question for the jury. If he is suddenly threatened with a deadly weapon, very slight evidence would be sufficient to justify the jury in concluding that he had no time or opportunity to retreat and therefore could stand his ground. The assault "may be so fierce and so imminent as not to allow him to yield a step without manifest danger of life or great bodily harm, and then in his defense, he may kill his assailant instantly." *State v. Newcomb, Houst. Cr. Cas.* 60, 70.[9] True, there is a real difference in the two rules; but, again, we cannot think it of such great moment as to require the overruling of an unbroken series of judicial pronouncements.

We may add that in one respect the charge was more favorable to the defendant than the evidence warranted. The last paragraph of the charge above quoted contains an instruction relating to "one assaulted in a sudden affray" who honestly believes that he is in imminent danger. Quillen's evidence is that the attack on him had ceased; that he walked to his car, took out his shotgun and loaded and "then stepped over to his left with the gun in his hands". Since the immediate cause of the shooting was not a sudden affray the instruction referred to was not required.

■ Moreover, the State, if it had requested it, would have been entitled under the facts of this case to a charge that self-defense is not available to one who deliberately provokes the difficulty that makes the killing necessary. *State v. Stevenson,* 8 *W. W. Harr.* 105, 109, 188 *A.* 750.

We find no error in the charge upon the duty to retreat.

[9]We see no reason why this charge should not be given if the facts warrant. Of course, it would not have been appropriate in this case.

3. Quillen next contends that the court erred in refusing to give the following charge:

"The force that one is justified in using is greater where the attack is made by a number of persons than where the attack is by only one. An assault by a number inspires more terror and is attended by more danger than an assault by only one. He who is assaulted by a number may justly act with more promptness and more force, even to the extent of using a deadly weapon, than where the assault is by only one."

As above stated, the evidence for the defense clearly showed that the assault on Quillen was separated from the shooting by an appreciable period of time. At the time Quillen shot he was not being "attacked by a number of persons". He was in danger, according to the defense testimony, from one person only— Raymond, who, it is said, had a weapon in his hand. The charge was not predicated upon the facts and was inappropriate. It is suggested that whether the preceding assault had ceased was a question for the jury, but this contention is clearly unsound. There was no issue of this sort presented, and hence there was no error in refusing the requested charge.

4. Quillen also objects to the court's charge upon the burden of proof as to the cause of death. Charging upon the contention that there was proof of an independent cause of death, the court said:

"Where such a defense is offered and relied upon, the burden is upon the accused to establish satisfactorily that the treatment of the wound was the sole cause of death. A different rule would tend to give immunity to criminal acts and would take away an essential safe-guard of human life."

The Court also charged:

"If you are satisfied that the accused unlawfully [inflicted] upon the defendant the wound, but entertain a reasonable doubt whether it was such a wound as is calculated or likely to en-

danger human life, and whether death resulted therefrom, your verdict should be not guilty."

For the reasons hereafter stated, we find it unncessary to consider whether the first quoted charge is correct, or whether, if incorrect, it was cured by the subsequent charge on reasonable doubt. It is supported by *State v. Morahan*, 7 *Penn.* 494, 77 *A.* 488, and *State v. Johnson*, 6 *W. W. Harr.* 341, 175 *A.* 669. See also *Commonwealth v. Hackett*, 2 *Allen, Mass.*, 136. But we have some doubt upon the matter, because a claim of an intervening and independent cause of death would seem to deny the existence of a homicide—the very basis of the State's charge.

■ However, we do not reach this question, nor any of Quillen's other objections to the charge upon the cause of death, because we are satisfied that the defense failed to adduce any evidence whatever tending to show an independent cause of death. The most that was shown was that the embolism that caused death probably happened as a result of the skin operation. But the skin operation was part of the treatment of the wound. What is more, it was proper treatment, as the medical witnesses for the defense admitted. There was no suggestion in the testimony of maltreatment. Dr. Layton's opinion that there is "a question of time of performing" the operation does not, as counsel suggests, contain any implication of maltreatment. The medical testimony in this case is uncontradicted that the deceased suffered a serious gunshot wound, and that he died of an embolism attributable either to the wound itself or to the treatment of it by qualified medical men.

■ In the light of the undisputed facts, the difference of opinion upon the origin of the blood clot was wholly immaterial. A malady or disorder attributable to orthodox treatment of a wound is not in law an independent cause of death. If the death of the wounded person results from or in the course of treatment by medical men who follow the usual course of practice that good practitioners adopt in endeavoring to heal the patient, the person who has inflicted the wound is chargeable with the death. As is said in *Wharton on Homicide*, § 199:

"Now it is one of the ordinary consequences of a wound that a medical man should be called in to treat it; and it is one of the probable incidents of medical practice that the patient should die under treatment. And the person inflicting the wound is responsible for this, as one of the consequences which in the natural course of events, result from his unlawful act."

We repeat that Quillen failed to adduce any evidence whatever upon which a jury could have based a finding of an independent cause of death. A factitious issue was made over a difference of professional opinion upon the question of the place of origin of the blood clot. It follows that any error in the charge (if there was any) in submitting this issue to the jury was harmless.

5. There remains for consideration the overruling of the motion to quash the jury panel. The facts are these:

To serve as petit jurors at the June Term, 1953, of the Superior Court for Sussex County there had been drawn sixty-four persons, as required by law for the trial of homicide cases. 10 *Del. C.* § 4517. Twenty-four of these were excused. On July 10, 1953, the Court entered an order for the drawing of additional jurors, pursuant to the provisions of 10 *Del. C.* § 4510, which reads in part:

"If either before or after the first day of any term of Court it appears that the number of grand or petit jurors summoned to appear at the term of Court is insufficient, then the Resident Associate Judge of the County in which the term of Court is to be held, or in his absence then any other Judge of the Superior Court, may enter an order for filling up the requisite number of jurors to serve at the Court."

The order recited that the number of jurors summoned to appear was insufficient, and directed the Jury Commissioners to draw forty-six persons to serve as petit jurors. Allowing for those already excused, the additional drawing brought the number of the panel up to eighty-six, instead of sixty-four. Because of the excess, the panel is claimed to have been illegally drawn.

The indictment of Quillen for first degree murder was returned on February 2, 1953. The case was continued to the April Term, when certain proceedings were had with respect to bail. See *Quillen v. Betts*, 9 *Terry* 93, 98 *A.* 2d 770. The case was continued to the June Term, and on July 17th (seven days after the entry of the order above mentioned) was continued for trial to September 21st. That day Quillen was arraigned and pleaded not guilty, and the trial was begun.

The docket entries show no record of the filing of any challenge to the array. The Attorney General concedes, however, that on the morning of September 21st, before the jury had been sworn, Quillen's counsel made an oral motion to quash the panel of jurors drawn pursuant to the order of July 10th. Presumably the reason assigned was the same as that advanced here. The court denied the motion, and on the motion for a new trial adhered to its decision.

Whether a statute fixing the number of jurors to be drawn is to be construed as mandatory or directory may be a debatable question. But it is clear that even if it be mandatory, such an illegality may be waived. Thus it is waived unless taken advantage of before the jury is sworn. Rule 24, *Rules of Criminal Procedure, Del. C. Ann.* The right to challenge the array is a right that under some circumstances may be lost by conduct. It may be waived by failure to make a timely motion. 31 *Am. Jur. Jury*, § 80.

The facts of this case clearly show that Quillen is chargeable with unexplained and prejudicial delay in making his motion to quash the panel. For the trial of a case of capital felony our law requires a court of three judges. *Constitution*, Article IV, § 5. The summoning of a panel of sixty-four petit jurors, instead of the ordinary panel of thirty-six, is also required. When Quillen's motion was made, the court had already assembled, upwards of eighty jurors (we are informed) were in attendance, and the State was ready for trial. We are justified in believing that witnesses were present awaiting call. If the

court was to give thorough consideration to the legal questions raised by the motion, a further continuance of the trial would have been necessary, and the jurors and witnesses would have had to be discharged, at considerable expense to the county. A period of two months and eleven days had elapsed between the date of the order and the date of trial. No reason is assigned why the motion could not have been made within a reasonable time after the entry of the order. Counsel must have learned (at least should have learned) of the excess in the number summoned when the members of the additional panel were investigated.

Unexplained delay in challenging a panel of petit jurors has been held to be a sufficient reason to deny a motion of this sort. In *United States v. Brookman, D. C.*, 1 *F.* 2d 528, the defendant filed a motion to quash the panel of petit jurors when the case was called for trial, thirty days after arrest and twelve days after the indictment had been found. The court reviewed the federal decisions on the point and held that the motion came too late. A similar holding is found in *United States v. McClure, D. C.*, 4 *F. Supp.* 668, 671, in which it is said that such an objection "is not properly founded upon circumstances so fraught with laches."

Our conclusion is that under the facts of this case the delay was inexcusable and was prejudicial to the State. Rule 24 above referred to does not control the case. It does not purport to cover the field of waiver based upon prejudicial delay.

The motion to quash the panel of jurors was properly denied.

We find no error in the record, and the judgment of the Superior Court is affirmed.