Gregory H. WRIGHT, Defendant
below, Appellant,

v.

STATE of Delaware, Plaintiff
below, Appellee.

Supreme Court of Delaware.

Submitted Dec. 15, 1976.

Decided May 27, 1977.

John B. Kennedy, Wilmington, for defendant below, appellant.

Merritt Burke, III, and Lawrence B. Steele, III, Deputy Attys. Gen., Georgetown, on behalf of the State of Delaware, Georgetown, for plaintiff below, appellee.

Before HERRMANN, Chief Justice, DUFFY and McNEILLY, Justices.

McNEILLY, Justice:

Defendant was convicted by a Superior Court jury of murder in the first degree, 11 *Del.C.* § 636,[1] and sentenced to life imprisonment. In this appeal he raises nine contentions, including the propriety of exclusion of evidence of medical malpractice and maltreatment as an intervening cause of death in a murder case, which we will consider in this opinion. We affirm the conviction.

### I.

Defendant spent the night of January 28, 1974, at the apartment of friends in Laurel. The following morning he and a friend, who was staying in the same apartment, got up at about 10:30 or 11:00 a. m., drank a half pint of ginger brandy together, and went to a sandwich shop. While there they met a group of workmen on their lunch hour, including the victim, Elmer Caudill, who were acquaintances of the defendant, exchanging greetings and some ordinary conversation.

Testimony of witnesses indicates that defendant acted in an abusive manner while in the sandwich shop, although no unpleasantness was directed toward the victim. The group left the shop together, the victim getting into the passenger side of a truck driven by one of the other workmen. Defendant then walked over to the driver's

---

1. 11 *Del.C.* § 636 provides in pertinent part:
   "(a) A person *is guilty of murder in the first degree* when:

   "(1) He intentionally causes the death of another person  . . . ."

side of the truck, asked the driver whom he had with him, to which the driver responded, "I got Elmer Caudill." At this point defendant reached his hand across the driver's chest and shot the victim with a .25 caliber handgun.

An ambulance was called for the victim, but because it did not arrive quickly enough, one of the workmen took the victim to Nanticoke Memorial Hospital. The victim was admitted about 12:15 p. m., operated on about 1:33 p. m., and died about 3½ hours later. According to the State Medical Examiner, the victim died of "irreversible shock due to a massive hemorrhage due to a gun shot wound that involved the aorta and the inferior vena cava as well as various other organs in his body."

At trial, the defendant asserted two primary defenses, (1) that the cause of the victim's death was medical malpractice or maltreatment rather than his acts, and (2) that he did not have the malice aforethought required for first degree murder because he acted while suffering from an epileptic seizure. The Trial Court prohibited proof of the first and the jury resolved the second against defendant.

## II.

Defendant contends that he was denied his right to due process, a fair trial, and the Sixth Amendment right to call witnesses on his behalf as a consequence of the Trial Court's refusal to permit him to introduce evidence relating to the malpractice of the physicians and maltreatment of the hospital personnel when this directly concerned the ultimate issue: the cause of death of the victim.

### A.

Set forth in more detail, defendant asserts the following:

Defendant called as his witness Dr. Penserga, the physician in charge of the victim's treatment at Nanticoke Memorial Hospital, and subpoenaed Drs. Rosales and Cooper, who had participated in the treatment, for the purpose of establishing malpractice and maltreatment of the victim by the physicians and the hospital personnel. This testimony was offered to prove that defendant did not cause the death and to negative the element of "intentionally" causing death, which is required under 11 Del.C. § 636(a)(1) for a first degree murder conviction.

Dr. Penserga testified that, (1) a surgical procedure (splenectomy) which had been performed was omitted from the medical records, (2) the wording of the medical records had been changed prior to trial (superior to inferior vena cava), (3) other omissions were made from the record, (4) a mistake was made regarding a blood transfusion, and (5) he was mistaken as to the time of victim's arrival and the operation. Proof was also offered that the hospital delayed giving emergency medical treatment, and defendant asserted that there were other serious unspecified omissions from the surgical procedures undertaken.

The Trial Court struck the testimony of Dr. Penserga from the record and prohibited further testimony by defense witnesses on the issue of cause of death. Defendant asserts that this was error under Delaware law permitting proof that the cause of a victim's death was medical malpractice or maltreatment. See *Quillen v. State,* Del. Supr., 10 Terry 114, 110 A.2d 445, reh. denied, 10 Terry 163, 112 A.2d 848 (1955); *State v. Johnson,* Del. Oyer and Terminer, 6 W.W.Harr. 341, 175 A. 669 (1934); *State v. Morahan,* Del. Oyer and Terminer, 7 Pennewill 494, 77 A. 488 (1895).

### B.

■ The *Johnson* and *Morahan* cases, supra, set forth the text of jury instructions, requiring that for medical malpractice or maltreatment to relieve a defendant of homicide liability, the malpractice or maltreatment must have been the *sole* cause of death. *State v. Johnson,* supra, at 670; *State v. Morahan,* supra, at 489. Stated conversely, if a wound, even if not mortal, is a causal factor in bringing about death, a defendant will be liable for homicide.

In *Quillen v. State,* supra, this Court failed to reach the question of the propriety of a charge given pursuant to *Morahan,* because the defense failed to present any evidence tending to show an independent cause of death. The victim in *Quillen* died suddenly of an embolism resulting from a skin graft necessitated by the wound received by the victim; there was no suggestion of maltreatment. The Court stated:

"In light of the undisputed facts, the difference of opinion upon the origin of the blood clot was wholly immaterial. A malady or disorder attributable to orthodox treatment of a wound is not in law an independent cause of death. If the death of the wounded person results from or in the course of treatment by medical men who follow the usual course of practice that good practitioners adopt in endeavoring to heal the patient, the person who has inflicted the wound is chargeable with the death." 110 A.2d at 454.

The rationale for the *Quillen* rule is that treatment is a natural and probable result of a wounding, and death is a probable incident of treatment; therefore, the defendant should be responsible for the natural consequences of his act. *Id.,* quoting *Wharton on Homicide* § 199. The rule of *Quillen* is that where no malpractice or maltreatment is shown and usual procedures are followed, medical treatment will not be considered an intervening cause of death. Since there was no issue of malpractice or maltreatment in *Quillen,* the question presented by defendant is one of first impression for this Court.

The law of other jurisdictions comports with the rule of *Johnson and Morahan.* Generally, a defendant is liable for homicide even though subsequent malpractice or maltreatment is shown to be a causal factor in the death of the victim. See 1 *Wharton's Criminal Law and Procedure* §§ 201–02; 40 Am.Jur. *Homicide* § 19; 40 C.J.S. *Homicide* § 11, Annot., 100 A.L.R.2d 769, *Homicide: Liability Where Death Immediately Results from Treatment or Mistreatment of Injury Inflicted by Defendant.* Where a defendant inflicts a wound calculated to endanger or destroy life, or a wound from which a victim would have died without treatment, he is usually liable for homicide even though the immediate or a contributing cause of death was erroneous or unskillful treatment by the victim or medical personnel. *Ingram v. State,* 29 Ala.App. 144, 194 So. 694, 695 (1939), cert. denied, 239 Ala. 244, 194 So. 694 (1940); *Hall v. State,* 199 Ind. 592, 159 N.E. 420, 426 (1928); see *Wharton,* supra, § 201; 40 C.J.S. *Homicide* § 11. The rationale for the rule is that negligent treatment is a foreseeable consequence of a wounding and therefore is deemed to be within the contemplation of a defendant when he acts. *Wharton,* supra, § 201; Annot., 100 A.L. R.2d at 773, § 2; see *People v. McGee,* 31 Cal.2d 229, 187 P.2d 706 (1947); *Commonwealth v. Cheeks,* 423 Pa. 67, 223 A.2d 291, 294 (1966) (defendant liable on "chain of causation" theory where victim of stabbing, suffering from hallucinations, the cause of which was disputed, removed a tube leading to his stomach allowing gastric juices to enter his lungs and resulting in death); *State v. Tomasi,* 137 Conn. 113, 75 A.2d 67, 70 (1950) (one who inflicts wound calculated to destroy life cannot escape liability for ensuing death by placing blame on carelessness of victim or unskillful treatment); *King v. Commonwealth,* 285 Ky. 654, 148 S.W.2d 1044, 1046 (1941); *Baker v. State,* Okl.Cr.App., 292 P. 82 (1930).

A limitation on the rule is generally recognized where a wound is not in itself mortal and the victim dies *solely* as a result of unskillful treatment. In such a case a defendant will not be liable for homicide. *Wharton,* supra, § 201; 40 C.J.S., supra; Annot., 100 A.L.R.2d at 786, § 7; *State v. Jackson,* Iowa Supr., 223 N.W.2d 229 (1974); *State v. Myers,* 59 Ariz. 200, 125 P.2d 441 (1942); *Crews v. State,* 44 Ga.App. 546, 162 S.E. 146 (1932); *Hall v. State,* supra, 159 N.E. at 426 n. 1; *People v. Kane,* 213 N.Y. 260, 107 N.E. 655 (1915); *Odeneal v. State,* 128 Tenn. 60, 157 S.W. 419 (1913).

We summarize and approve the rules of causation as follows: Where a wound is dangerous or calculated to destroy

life, negligence, mistake, or lack of skill by treating medical personnel will not be an intervening cause of death and the person causing the wound will be liable for homicide. Where, however, a wound is not dangerous or calculated to produce death, and the victim dies solely as a result of improper or negligent treatment, this will be an intervening cause of death and the defendant will not be liable for homicide. See *People v. McGee,* supra, 187 P.2d at 712–13.

■ Generally, expert medical testimony will be required to support a finding that a wound is not in itself dangerous or calculated to produce death.

### C.

■ Turning now to defendant's contention that the Trial Court erred in excluding evidence of malpractice and maltreatment by the physicians and hospital personnel, it is clear that the offer of proof was insufficient to establish an intervening cause of death. Defendant shot the victim with a .25 caliber handgun in his upper torso; this caused a dangerous wound calculated to destroy life. Under these circumstances it would be impossible as a matter of law to prove that subsequent medical maltreatment was the intervening cause of death; therefore, there was no error in the Trial Court's rejection of the evidence offered upon this issue.

■ We further note in passing that an examination of the record indicates that most of the errors in treatment asserted by defendant relate to record keeping rather than quality of care. Defendant's primary contention appears to be that treatment was unnecessarily delayed for over an hour. Two answers to this appear. First, the record indicates that the operation was begun as soon as possible after the victim was brought out of shock. Second, as the California Supreme Court pointed out in *People v. McGee,* supra, where a ten hour delay in treatment was held not to be an intervening cause of death, another's failure to act cannot save a defendant from the consequences of his criminal act. 187 P.2d at 714.

### III.

Defendant's second contention is that the Trial Court denied him due process and a fair trial by failing to ask the jury *voir dire* questions relating to presumption of innocence, proof beyond a reasonable doubt, and burden of proof.

■ The extent of a *voir dire* examination of prospective jurors and the questions to be permitted lie within the broad discretion of the Trial Court, subject to the essential demands of fairness. *Parson v. State,* Del.Supr., 275 A.2d 777, 780 (1971); *Aldridge v. United States,* 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). There is no right to propound all questions deemed proper by defendant, *Jacobs v. State,* Del. Supr., 358 A.2d 725, 728 (1976), and we note that in this case a total of one hundred forty-seven questions were submitted by the defense. Any limitation on the *voir dire* imposed by the Trial Court will not be disturbed absent a clear showing of abuse of discretion to the prejudice of the defendant. *Parson v. State,* supra, at 781. We find no such abuse here.

■ In the recent case of *Jacobs v. State,* supra, this Court rejected the defendant's contention that the Trial Court erred, *inter alia,* in refusing to propound questions relating to burden of proof. As in that case, we find that the essential demands of fairness have been met by the questions included in the *voir dire.* The defendant having demonstrated no resulting prejudice from the refusal to propound the requested questions, his contention is without merit.

### IV.

Defendant next asserts that he was denied due process and equal protection because he was denied the use of subpoena power for the purpose of interviewing witnesses prior to trial in preparation of this case, when the State had such power.

■ This denial, contends defendant, left him inadequately prepared for trial. Defendant would have used the subpoena

power to interview the physicians who treated the victim and to examine hospital records, in order to gather evidence of malpractice and maltreatment. In view of our conclusion that such evidence was immaterial, we need not reach the substantive aspects of defendant's argument. No prejudice can result from denial of access to material that is inadmissible and which will not lead to the discovery of admissible evidence.

## V.

Defendant's next two contentions concern the introduction of certain testimony by the State.

## A.

■ First, it is asserted, the Trial Court denied defendant due process and a fair trial by permitting the prosecution to enter evidence relating to the medical records of the defendant when this had not been made available by the State during pre-trial discovery. The short answer to this contention was argued by the State and is supported by the record: The "Psychiatric Progress Letters/Notes" used in presentation of rebuttal testimony by a State's witness were unknown to the prosecution until the day of their use. There was no violation of the pre-trial discovery order.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. *ATTORNEY FOR DEFENDANT:*
   "I agree with what the Attorney General has stated that at this point in time I would take the position that what prejudice may have been incurred by the defense as a result of these statements, whether it's been no factual evidence in the record to back them up would be waived as far as any—or as concerning—as far as the defense is concerned at this point."
   *THE COURT:*
   "Your objection is obviously frivolous and it is going to be denied and overruled."
   *ATTORNEY FOR DEFENDANT:*
   "If that is the case I would *request* a motion *to* suppress the oral statements of the defendant at this time with *voir dire* examination of this witness prior to him testifying and before the jury."

## B.

■ Second, defendant contends that his rights to due process, a fair trial, and to confront and cross-examine witnesses was violated when the Trial Court refused on cross-examination of the State's expert medical witness to permit the defendant the opportunity to review the contents of medical files forming the basis of the testimony. The record shows that counsel for defendant had the opportunity to review the files in question and in fact did review them before proceeding with cross-examination. This contention similarly has no merit.

## VI.

The sixth argument presented by defendant is that the Trial Court violated his right to due process by allowing testimony of an out of court statement by defendant without first permitting the defense to have a hearing outside the presence of the jury to determine its voluntariness.

During direct examination, defendant testified that he rarely carried the gun used in the shooting. For impeachment purposes, the State presented the testimony of the arresting officer that defendant told him that he carried the gun at all times. A timely objection to the State's evidence was registered by defense counsel; however, the objection was made on the ground defendant's *Miranda*[2] rights were violated rather than on the ground of voluntariness.[3]

*THE COURT:*
"We have been up here seven or eight minutes and you have not said anything yet. What grounds do you have for suppression?"
*ATTORNEY FOR DEFENDANT:*
"My grounds are that the man was arrested. He was taken to the police station and a statement was abstracted from him on January 29. The oral version I've got from the prosecutor—January 30 a statement was taken from him at that time. Certain words that were mentioned would not benefit him and they do constitute a confession."
"Our position is that he did not knowingly understand any warnings that were given to him on January 29th. He was incapable of intelligently waiving any rights that he had under *Miranda* and that he may in fact never have received the rights under *Miranda* on the 29th and on the 30th of January and as a result of being maced and coming out of the epileptic seizure or still in the throes of it—"

The law is well settled that statements made where the *Miranda* rights have been violated are admissible for impeachment purposes, as the right to testify in one's defense does not extend to permit the commission of perjury. *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Williams v. State,* Del. Supr., 301 A.2d 88 (1973). An objection not made at trial may not be made on appeal; therefore the issue of voluntariness is not properly before this Court. *Rickards v. State,* Del.Supr., 6 Terry 573, 77 A.2d 199, 202 (1950).

This contention is without merit.

### VII.

Defendant's seventh and eighth contentions, that the Trial Court's refusal to rule on various objections and permit offers of proof denied his right to a fair trial, due process, and fundamental fairness and that the Trial Court's failure to instruct on the defense of intoxication denied his right to due process, a fair trial, and assert a valid defense, are also without merit.

The record does not support defendant's contentions concerning objections made at trial, and without reaching the question of whether voluntary intoxication is a defense, see *Pendry v. State,* Del.Supr., 367 A.2d 627 (1976), we conclude that consumption of one fourth of one pint of ginger brandy[4] does not amount to some credible evidence of intoxication. See 11 *Del.C.* § 303(c).[5]

THE COURT: "You have told us all that. *Miranda* obviously does not apply. This is perfectly permissible."

4. Defendant and a friend drank one half pint of ginger brandy together.

5. 11 *Del.C.* § 303(c) provides:

"(c) If some credible evidence supporting a defense is presented, the defendant is entitled to a jury instruction that the jury must acquit him if they find that the evidence raises a reasonable doubt as to the defendant's guilt."

6. 11 *Del.C.* § 242 provides:

### VIII.

We turn to defendant's final contention, that he was denied due process and the right to a fair trial as a result of the Trial Court's refusal to charge the jury on general criminal liability, 11 *Del.C.* § 242,[6] and the definition of voluntary act, 11 *Del.C.* § 243.[7]

At trial conflicting expert testimony was addressed to the factual question of whether defendant was suffering from an epileptic psychomotor seizure at the time of the shooting, proof of which would have relieved him of criminal liability.

The defense introduced expert testimony of a pediatric neurologist, who examined and treated defendant for childhood seizures from 1959 to 1961 resulting from ingestion of a foreign substance, and who diagnosed his problem as chronic epilepsy based upon his case history, description of the seizures, and analysis of his electroencephalogram, which was abnormal at that early time. A second expert, a psychiatrist, in response to a hypothetical question based upon defendant's medical background and actions on January 29, 1974, stated that in his opinion defendant was suffering from an epileptic psychomotor seizure at the time of the shooting. Additionally, testimony of family members and friends of defendant was introduced to establish that defendant had previously manifested peculiar conduct consistent with epilepsy.

In rebuttal, the State first introduced expert psychiatric testimony of the doctor who examined and observed defendant at Delaware State Hospital for a three month period subsequent to the shooting; he testified that, (1) epilepsy is primarily congeni-

"A person is not guilty of an offense unless his liability is based on conduct which includes a voluntary act or the omission to perform an act which he is physically capable of performing."

7. 11 *Del.C.* § 243 provides:

" 'Voluntary act' means a bodily movement performed consciously or habitually as a result of effort or determination, and includes possession if the defendant knowingly procured or received the thing possessed or was aware of his control thereof for a sufficient period to have been able to terminate his possession."

tal and seizures caused by ingestion of foreign substances are generally not symptomatic of epilepsy, (2) no clinical evidence of brain damage in defendant was found, (3) his problems were behavioral and related to excessive use of drugs and alcohol, (4) his descriptions of his seizures did not fit the characteristics of psychomotor epilepsy, and (5) on January 29, 1974, defendant could appreciate the wrongfulness of his acts. The State then called a second expert witness, the Director of the Community Mental Health Center for Sussex County (Center); he testified that he examined and observed defendant during 1970 and 1971, that he diagnosed defendant's problem as an antisocial personality, ruling out brain dysfunction, and that in 1974 defendant was treated at the Center, although not for an epileptic condition. Finally, a third State's expert testified that defendant's conduct on the day of the shooting was inconsistent with psychomotor epilepsy because his case history did not demonstrate repetitive behavior characteristic of psychomotor epilepsy.

The Trial Court charged the jury on the defense of mental illness or defect[8] under 11 *Del.C.* § 401,[9] and the jury determined that defendant was not suffering from a psychomotor seizure at the time of the shooting.

■ We find the cases cited by defendant in support of his contention, *Smith v.* *State,* Del.Supr., 243 A.2d 719 (1968); *Brown v. State,* Del.Supr., 233 A.2d 445 (1967), inapposite. The jury instructions properly explicated the basis for an acquittal on the ground of mental illness or defect, the defense here in issue. The additional instructions requested by defendant would have been cumulative, adding nothing to the jury's deliberative process. We find no merit to this contention.

Affirmed.

---

8. The relevant jury instruction appears below:
"  .   .   . In order to establish the affirmative defense of mental illness or mental defect, it is necessary for the defendant to satisfy you by a preponderance of the evidence of the following propositions: First. At the time of the conduct charged he was suffering from mental illness or mental defect. Secondly. As a result of such mental illness or mental defect, he lacked either substantial capacity to appreciate that his conduct was wrong or sufficient will power to choose whether he would engage in the conduct which constituted the offense or whether he would refrain from engaging in it."
"If you find that the affirmative defense of mental illness or mental defect has been established by a preponderance of the evidence, your verdict should be not guilty by reason of insanity.   .   .   ."
"In this case, the defendant has contended that the mental illness from which he suf-

fered at the time of the offense was psychomotor epilepsy.   .   .   ."
(The Trial Court also read the text of 11 *Del.C.* § 401, setting forth the defense of mental illness or mental defect.)

9. 11 *Del.C.* § 401 provides:
"(a) In any prosecution for an offense, it is an affirmative defense that, at the time of the conduct charged, as a result of mental illness or mental defect, the accused lacked substantial capacity to appreciate the wrongfulness of his conduct or lacked sufficient willpower to choose whether he would do the act or refrain from doing it."
"(b) If the defendant prevails in establishing the affirmative defense provided in subsection (a) of this section, the trier of facts shall return a verdict of 'not guilty by reason of insanity.' "